NAME **RAYMOND GREEN**

PRISON IDENTIFICATION/BOOKING NO.
**E-68189**

ADDRESS OR PLACE OF CONFINEMENT
**CORRECTIONAL TRAINING FACILITY**
**POB 689 SOLEDAD, CA 93960-0689**

Note:    It is your responsibility to notify the Clerk of Court in writing of any
change of address. If represented by an attorney, provide his name,
address, telephone and facsimile numbers, and e-mail address.

**FILED**

**2007 SEP 18 PM 5:01**

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**RAYMOND GREEN**

FULL NAME *(Include name under which you were convicted)*
                                        Petitioner,

v.

**BEN CURRY, WARDEN(A)et al.,BPT,**
**A.SCHWAREZENGGER GOVERNOR, & THE**
**ATTORNEY GENERAL OF CALIFORNIA**

NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER
                                        Respondent.

CASE NUMBER:

CV **07-6066-** GHK (FFM)

To be supplied by the Clerk of the United States District Court

☐ _____ **AMENDED**

**PETITION FOR WRIT OF HABEAS CORPUS**
**BY A PERSON IN STATE CUSTODY**
28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION _____
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
*(List by case number)*
CV _____
CV _____

### INSTRUCTIONS - PLEASE READ CAREFULLY

1.    To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.    In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge the judgment entered by a different California state court, you must file a separate petition.

3.    Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.    Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.    You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

5.    You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

6.    When you have completed the form, send the original and two copies to the following address:

   Clerk of the United States District Court for the Central District of California
   United States Courthouse
   ATTN: Intake/Docket Section
   312 North Spring Street
   Los Angeles, California 90012

**DOCKETED ON CM**

**SEP 25 2007**

BY _____

PLEASE COMPLETE THE FOLLOWING: (*Check appropriate number*)

This petition concerns:
1. ☐ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☒ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   **CORRECTIONAL TRAINING FACILITY(CTF)**
   a. Place of detention _____
   b. Place of conviction and sentence **SUPERIOR COURT OF CALIFORNIA LOS ANGELES**

2. Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked)*.
   a. Nature of offenses involved *(include all counts)*: **2nd degree murder**
   _____
   _____

   b. Penal or other code section or sections: **Penal Code § 187**
   _____
   _____

   c. Case number: **TA 003065**
   d. Date of conviction: **8-10-90**
   e. Date of sentence: **9-7-90**
   f. Length of sentence on each count: **19 yrs to life**
   _____

   g. Plea *(check one)*:
      ☑ Not guilty
      ☐ Guilty
      ☐ Nolo contendere

   h. Kind of trial *(check one)*:
      ☑ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?    ☐ Yes ☐ No
   If so, give the following information for your appeal *(and attach a copy of the Court of Appeal decision if available)*:
   a. Case number: _____ N/A _____
   b. Grounds raised *(list each)*:
      (1) _____

a. (1) Name of court: _____ *N/A* _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

(5) Date of decision: _____

(6) Result _____
_____

(7) Was an evidentiary hearing held?    ☐ Yes    ☐ No

b. (1) Name of court: _____ *N/A* _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

(5) Date of decision: _____

(6) Result _____
_____

(7) Was an evidentiary hearing held?    ☐ Yes    ☐ No

c. (1) Name of court: _____ *N/A* _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

(7) Was an evidentiary hearing held?    ☐ Yes  ☐ No

7. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the facts supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:**    *Exhaustion Requirement*:  In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.

a. Ground one: **Petitioner's liberty interest** in/on parole has been violated base solely on petitioner's committed offense.

(1) Supporting FACTS: **Pardon and Parole**(U.S.C.A. Const.Amend.14; West's Ann.Cal.Penal Code § 3041;15 CCR § 2402.). And under 28 USC § 2254(a) this Court may entertain a petition for writ of habeas corpus by a person in state custody.See Memorandum of points & authorities following 8 of 10.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes  ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☒ Yes  ☐ No

b. Ground two: _____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes  ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes  ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

c.  Ground three: _____

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

d.  Ground four: _____

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

e.  Ground five: _____

_____

(1) Supporting FACTS: _____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

8. If any of the grounds listed in paragraph 7 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: _____

_____

_____

9. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?
☐ Yes    ☐ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.   (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?        ☐ Yes    ☐ No

b.   (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

(7) Was an evidentiary hearing held?    ☐ Yes    ☐ No

10. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?    ☐ Yes    ☐ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

11. Are you presently represented by counsel?    ☐ Yes    ☐ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding,

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _09-06-07_        _[signature]_
        *Date*                *Signature of Petitioner*

1  RAYMOND GREEN
   CDC#E-68189
2  CORRECTIONAL TRAIN.FAC.
   PO BOX 689 GWING 345L
3  SOLEDAD,CA 93960-0689
   In Pro Per
4

5

6

7      UNITED STATES DISTRICT COURT

8      CENTRAL DISTRICT OF CALIFORNIA

9

10

11  In re,                        ) No.
                                  ) CALIFORNIA SUPREME COURT#S151624
12  RAYMOND GREEN,                ) COURT OF APPEAL#B195103
                                  ) SUPERIOR COURT#TA003065
13  PETITIONER,                   ) PETITION FOR WRIT OF HABEAS CORPUS
                                  ) AND MEMORANDUM OF POINTS AND
14  ON HABEAS CORPUS              ) AUTHORITIES IN SUPPORT THEREOF.
                                  )
15  _____ )

16  TO:THE HONORABLE JUDGES AND MAGISTRATE'S JUDGES OF THE UNITED

17  STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA:

18              **PARDON AND PAROLE**
              (U.S.C.A.Const.Amend.14.)
19

20  Petitioner,RAYMOND GREEN,Appealing to this court due to trial

21  court denial(The only opinion),Appellate court denial and Calif-

22  ornia(CA)Supreme court denial(Attached within exhibit(ex,or ex's

23  )A & Board of Hearins consideration,BPH).

24  Pursuant to the Antiterrorism and Effective Death Penalty Act of

25  1996(AEDPA),a federal court may grant relief only if the state

26  court adjudication:(2)resulted in a decision that was based on an

27

28                    1 of 2 pages

unreasonable determination of the facts in light of the evidence presented at the state court proceedings.**Early v.Packer**,537 U.S. 3,123 S.Ct.362,364,154 L.Ed.2d 263(20020;**Williams v.Taylor**,529 U.S.362,412-13,120 S.Ct.1495,146 L.Ed.2d 389(2000);28 USC § 2254 (d)(2);And the "unreasonable application" clause of § 2254(d)(1). See also,**Van Tran v.Lindsey**,212 F.3d 1143,1153-54(9th Cir.2000); The Supreme Court "unreasonable application" means more than just a "clear error,"but instead means a decision that is "objectively unreasonable."**Lockyer v.Andrade**,____U.S.____,___,123 S.Ct.1166, 1175,155 L.Ed.2d 144(2003).

Petitioner challenge BPT/BPH and the state courts that petitioner would pose an unreasonable threat to public safety(Penal Code § 3041,subd.(b))if released.All second degree murders by definition involve some callousness i.e.,lack of emotion or sympathy,emoti- onal insensitivity,indifference to the feelings and suffering of others.And parole is the rule,rather than the exception,and a conviction for second degree murder does not automatically render one unsuitable.See,**In re Smith**(2003)114 Cal.App.4th 343, 366 7 Cal.Rptr.3d 655.And BPH can not rely on the bare conviction for second degree murder to deny parole under the exceptionally callous or cruel factor.And to deny parole on that ground there must be some evidence petitioner engaged in conduct,apart from and beyond the minimum conduct necessary to convict him of second degree murder.There is no evidence petitioner tormented, terrorized,or injury/injured his victim before deciding to shoot

his victim ;  or that petitioner gratuitously increased or unnecessarily prolonged the victim's pain and suffering... was the crime callous? yes,however,are the facts of the crime (See,ex A-BPH-page(p.,p's)1 thru 85)some evidence that petit- ioner acted exceptionally callous(compare,Dannenberg,34 Cal.- 4th at 1071)disregard for the victim's suffering; or do the facts distinguish this crime from other 2nd degree murders as exceptionally callous ? no,because the relevant evidence shows no conduct(beyond the minimum required for conviction- of 2nd degree murder)showing a callous disregard for human suffering,BPH'S use of this factor was "arbitrary and capric- ous!"See, **In re Scott**, (2005)133 Cal.App.4th 573;**Rosenkrantz v. Marshall**(C.D.Cal.2006)(F.SUPP.2d,2006 WL 2327085.)and the federal court ordered Mr.Rosenkrantz released in an order dated August 1,2006.Yet,the federal court did not address the issue of whether the Governor had(or has)a-no-parole-policy,or whether the Governor's conduct violated the "ex post facto" Clauses of state and federal constitutions.In Rosenkrantz case, the defendant brutally murdered his victim after a full week of careful preparation rehearsal and execution(29 Cal.4th at- p.,678).The standard of judicial review that state courts are applying to parole decisions by the Board or the Governor is very difficult(or unfair as to,the law,rules,statutes,and- regulations)for prisoners to prevail under.For example,we/you have lifers here at Correctional Training Facility,25 to life, 15 to life,and 7 to life,some of them have been confined 25,30,

3 of 4 p's

and even 40 years in(at a level 2 facility)of which to me,et al.
,is an abuse of authority and the law(under USCA Const.Amend.-
14.,state & federal)by those in authority.And despite this
difficult or unfairness,Mr.Rosenkrantz and other lifers(In re-
Smith(2003)109 Cal.App.4th 489,and In re Scott(2005)133 Cal.-
App.4th 573.)have obtained orders for their release.

## CONCLUSION

Petitioner prays this court order BPH FOR a rehearing within
30 days,finding petitioner suitable for parole,or at the very
least,setting petitioner's terms "uniformly" as mandated by
the legislature.

## VERIFICATION

I,RAYMOND GREEN,petitioner in the above entitled action have
prepared and read the foregoing PETITION FOR WRIT OF HABEAS
CORPUS(28 USC § 2254),and the matters therein are true and
correct to the best of my knowledge,belief,and understanding.
Executed on this _6ᵗʰ_ day of _SEPTEMBER_ ,2007,in the city of
SOLEDAD,COUNTY OF MONTEREY CALIFORNIA UNDER PENALTY OF PERJURY.

RESPECTFULLY SUBMITTED,

RAYMOND GREEN

S151624

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RAYMOND GREEN on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

AUG 1 5 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION: 2

DATE: November 28, 2006

Raymond Green
E-68189
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

In Re:
Raymond Green
On
Habeas Corpus

B195103
Los Angeles County No. TA003065

THE COURT:

    Petition for Writ of Habeas Corpus is denied.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 23, 2006 | | | |
|---|---|---|---|---|
| Honorable: | RAYMOND GREEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 003825
In re,
RAYMOND GREEN,
    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed January 18, 2006 and the complete transcript of petitioner's challenged suitability hearing filed June 21, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole. (See Cal. Code Regs., tit. 15, § 2402; *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received into custody on September 19, 1990 and is serving a term of 19 years to life with a minimum parole eligible date of November 17, 2002. Petitioner was convicted of second degree murder with use of a firearm, in violation of Penal Code sections 187 and 12022.5. The record reflects that on February 23, 1988, a witness observed petitioner argue with the victim for stealing cocaine from him and then shoot the victim in the upper left thigh with an automatic rifle and attached bayonet. The victim was sitting on the floor bleeding and he begged petitioner to let him go to the hospital. Petitioner told the victim to shut up and refused to let the victim leave. Two days later, a bicyclist discovered the victim's body. An autopsy report revealed that the victim suffered gunshot wounds to his leg, which severed the victim's femoral artery and fractured the victim's femur, causing his death.

The record reflects that the Board found petitioner unsuitable for parole after a parole consideration hearing held on October 27, 2005. Petitioner was denied parole for four years. The Board concluded that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison. The Board based its decision on several factors, including his commitment offense.

The Court finds that that there is some evidence to support the Board's findings that petitioner is unsuitable because the motive of the crime was very trivial in relation to the offense. (See Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(E).) The record further reflects that the Board also relied on several additional factors in denying petitioner parole at this time, and there is some evidence to support that decision. There is some evidence that petitioner is unsuitable due to petitioner's 115 disciplinary violations, two of which occurred since his last Board hearing. (See Cal. Code Regs., tit. 15, § 2402, subd. (c)(6).) In addition, there is some evidence that petitioner needs to participate in additional institutional programming and self-help to indicate an enhanced ability to function within the law upon release. Petitioner only started substance abuse programming in 2004 and due to the drug-related nature of his crime, there is some evidence he could benefit from additional

1

Minutes Entered
10-23-06
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | OCTOBER 23, 2006 | | | |
|---|---|---|---|---|
| Honorable: | RAYMOND GREEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 003825
In re,
RAYMOND GREEN,
        Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

participation in programming. The Board was acting within its authority when it considered petitioner's various preconviction and post conviction factors, yet concluded that he would pose an unreasonable threat to public safety. (See Penal Code § 3041, subd. (b).)

Therefore, the petition is denied.

The court order is signed and filed this date.

A true copy of this minute order is sent to the petitioner via U.S. Mail as follows:

Raymond Green
E-68189
Correctional Training Facility -- Soledad
P.O. Box 689
Soledad, CA 93960-0689

THE DOCUMENT TO WHICH THIS CERTIFICATE IS
ATTACHED IS A FULL, TRUE, AND CORRECT COPY
OF THE ORIGINAL ON FILE AND OF RECORD IN
MY OFFICE

ATTEST  10-27-06

JOHN A. CLARKE,
Clerk/Executive Officer of the Superior
Court of California, County of Los Angeles.

BY _Joseph M. Pulido_____, DEPUTY

JOSEPH M. PULIDO, S.C.C.
233219



2

| Minutes Entered |
|---|
| 10-23-06 |
| County Clerk |

# EXHIBIT   A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )
Term Parole Consideration    )      CDC Number E-68189
Hearing of:                  )
                             )      **INMATE**
RAYMOND GREEN                )
_____)      **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 27, 2005

PANEL PRESENT:

SUSAN FISHER, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

RAYMOND GREEN, Inmate
TOM HIGGINS, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____, No        See Review of Hearing
_____  Yes       Transcript Memorandum

**Marsha Mees, Peters Shorthand Reporting**

ii

INDEX

|                             | Page |
| --------------------------- | ---- |
| Proceedings                 | 1    |
| Case Factors                | 23   |
| Pre-Commitment Factors      | 35   |
| Post-Commitment Factors     | 45   |
| Parole Plans                | 65   |
| Closing Statements          | 75   |
| Recess                      | 77   |
| Decision                    | 78   |
| Adjournment                 | 85   |
| Transcriber Certification   | 86   |

--oOo--

1

1        P R O C E E D I N G S

2        PRESIDING COMMISSIONER FISHER:    All

3    right.    This is going to be a subsequent parole

4    consideration hearing for Raymond Green.    CDC

5    number E-68189.    Today's date is 10-27-05 and

6    we're located at the Correctional Training

7    Facility at Soledad.    The inmate was received on

8    9-19-90 from Los Angeles County.    The life term

9    began on 7-20-92 and the minimum eligible parole

10   date is 11-17-02.    The controlling offense for

11   which the inmate has been committed is second

12   degree murder.    Let's see here.    Case number

13   TA003065, count one, Penal Code section 187.

14   There was also a finding of the use of a

15   firearm.    That's Penal Code section 12022.5.

16   There was also a count two.    That is Penal Code

17   section 236 for false imprisonment.    The inmate

18   received a term of 19 to life.    Once again, the

19   minimum eligible parole date is 11-17-02.    We're

20   going to be tape recording today.    So for the

21   purpose of voice identification for the

22   transcriber we're each going to say our first

23   and last name and spell our last name.    When I

24   get to you, would you please also give me your

25   CDC number also please.

26        INMATE GREEN:    Yes.

27        PRESIDING COMMISSIONER FISHER:    Thank

2

1    you.  I'm going to start with myself and go to

2    my left.  Susan Fisher, F-I-S-H-E-R,

3    Commissioner.

4         **DEPUTY COMMISSIONER MEJIA:**  Rolando

5    Mejia, M-E-J-I-A, Deputy Commissioner.

6         **DEPUTY DISTRICT ATTORNEY HIGGINS:**  Tom

7    Higgins, H-I-G-G-I-N-S, Deputy District

8    Attorney, Los Angeles County.

9         **PRESIDING COMMISSIONER FISHER:**  Go ahead,

10   Mr. Green.

11        **INMATE GREEN:**  Raymond Green, G-R-E-E-N.

12        **PRESIDING COMMISSIONER FISHER:**  And your

13   CDC number.

14        **INMATE GREEN:**  E-68189.

15        **PRESIDING COMMISSIONER FISHER:**  Thank

16   you.  That's for the person that's going to be

17   transcribing what we're saying here.  Excuse me.

18   Before we get into the hearing here, I want to

19   ask you a couple of questions.  Are you familiar

20   with the Americans With Disabilities Act?

21        **INMATE GREEN:**  Yes.

22        **PRESIDING COMMISSIONER FISHER:**  It's

23   there on the table in front of you.

24        **INMATE GREEN:**  Yes, I'm familiar with it.

25   But yeah, I don't -- I don't -- I have no

26   disabilities.

27        **PRESIDING COMMISSIONER FISHER:**  You don't

3

1     have any disabilities.  Okay.  You did sign the

2     BPT 1073 Form stating -- on 10-14-04 -- that you

3     had no disabilities.  I have some questions that

4     I have to ask you before we can get started.  Do

5     you normally wear reading glasses?

6            **INMATE GREEN:**  Yes.  Yes.  When I read.

7            **PRESIDING COMMISSIONER FISHER:**  Okay.

8     And did you do an Olson Review on your file and

9     the prep work for the hearing today?

10           **INMATE GREEN:**  Well my hearing was

11    delayed three or four times since August.

12           **PRESIDING COMMISSIONER FISHER:**  Okay.

13           **INMATE GREEN:**  No, matter of fact, since

14    February.

15           **PRESIDING COMMISSIONER FISHER:**  Okay.

16           **INMATE GREEN:**  I was supposed to went to

17    the Board February.  They delayed it two or

18    three times since then and only had one Olson

19    Review.

20           **PRESIDING COMMISSIONER FISHER:**  Okay.

21           **INMATE GREEN:**  I didn't agree with the

22    counselor's report.  I had told her that, that I

23    didn't agree with this counselor's report by

24    Ellison because like right here she don't have

25    none of my -- I mean none of my academics.

26           **PRESIDING COMMISSIONER FISHER:**  Okay.

27           **INMATE GREEN:**  And my self-help therapy

4

1    that I've been participating in the last three

2    years.

3              PRESIDING COMMISSIONER FISHER:  Okay.

4    Did you have any opportunity to talk with the

5    counselor about it and try to get it

6    straightened out?

7              INMATE GREEN:  Yes.

8              PRESIDING COMMISSIONER FISHER:  Okay.

9              INMATE GREEN:  And she never --

10             PRESIDING COMMISSIONER FISHER:  She just

11   didn't get it taken care of?

12             INMATE GREEN:  Never got it updated.

13             PRESIDING COMMISSIONER FISHER:  Okay.  Do

14   you feel -- Do you feel adequately prepared to

15   go forward today?

16             INMATE GREEN:  Other than the counselor's

17   report.  If that's going to be --

18             PRESIDING COMMISSIONER FISHER:  Well

19   there should be -- If you've been participating,

20   there'll be chronos (indiscernible).

21             INMATE GREEN:  Well I have all my -- all

22   my certificates.

23             PRESIDING COMMISSIONER FISHER:  Okay.

24   Okay.  So anything that might not be there that

25   Mr. Mejia may not have, you probably have a copy

26   of.  Is that right?

27             INMATE GREEN:  Yes.  I have all my

5

1    certificates that she doesn't (indiscernible).

2         **PRESIDING COMMISSIONER FISHER:**  Okay.

3    Yeah, that's not a problem.  We don't go

4    necessarily by that.  We go by what's in your

5    Central File.

6         **INMATE GREEN:**  Okay.

7         **PRESIDING COMMISSIONER FISHER:**  Okay.  I

8    just want to make sure that you've got

9    everything you need and that you feel

10   comfortable going forward.

11        **INMATE GREEN:**  Yes.

12        **PRESIDING COMMISSIONER FISHER:**  Is this

13   the first time that you've represented yourself?

14        **INMATE GREEN:**  Yes.

15        **PRESIDING COMMISSIONER FISHER:**  Okay.

16   What made you decide to this time?

17        **INMATE GREEN:**  Well really I don't have

18   nothing to fight about.  I'm not trying to go

19   back to court no more.  I'm trying -- I'm trying

20   to figure out guidelines and provisions this

21   Board hearing -- being held under because I'm

22   (indiscernible) coming to the Board hearings and

23   no effect, you know.  I'm doing everything that

24   I supposed to do.

25        **PRESIDING COMMISSIONER FISHER:**  Okay.

26        **INMATE GREEN:**  But still nothing happens.

27        **PRESIDING COMMISSIONER FISHER:**  Okay.

6

1  (Indiscernible) things here real quick.  Do you

2  have your GED?

3         INMATE GREEN:  Yes.

4         PRESIDING COMMISSIONER FISHER:  Okay.  I

5  just need to make sure.  We have to make sure

6  that you're able to represent yourself so that's

7  the reason that I'm asking you questions here.

8  We have to get on the record the information to

9  be sure that, you know, you're not coming --

10 you're not coming in unprepared and that it

11 won't be to your disadvantage to represent

12 yourself.  So we want to make sure that

13 everything's covered here.

14        DEPUTY COMMISSIONER MEJIA:  This is his

15 -- This is his second hearing.

16        PRESIDING COMMISSIONER FISHER:  So you've

17 done --

18        DEPUTY COMMISSIONER MEJIA:  The initial

19 was in 2002.  This is his second.

20        PRESIDING COMMISSIONER FISHER:  This is

21 your -- This is your first subsequent hearing?

22 Is that what that is?

23        DEPUTY COMMISSIONER MEJIA:

24 (Indiscernible).

25        INMATE GREEN:  Well I've been -- I was

26 denied three years ago.

27        PRESIDING COMMISSIONER FISHER:  Right.

7

1          **INMATE GREEN:**  Right.  And then in '98 I

2     was denied three years then.  So this is like my

3     third hearing.

4          **PRESIDING COMMISSIONER FISHER:**  Okay.

5     Yeah, we don't have a transcript of that in

6     here.

7          **INMATE GREEN:**  Yeah, (indiscernible)

8     right there, see right there, you just had it.

9          **PRESIDING COMMISSIONER FISHER:**  No.  I

10    had --

11         **INMATE GREEN:**  See that report that --

12         **PRESIDING COMMISSIONER FISHER:**  This is

13    your 2002 hearing.

14         **INMATE GREEN:**  Right after that, let me

15    see.

16         **PRESIDING COMMISSIONER FISHER:**  This is

17    your -- Are you talking about this?

18         **INMATE GREEN:**  Yes.  That was -- That was

19    in '98.

20         **PRESIDING COMMISSIONER FISHER:**  That was

21    (indiscernible) --

22         **DEPUTY COMMISSIONER MEJIA:**  Ninety-eight

23    --

24         **PRESIDING COMMISSIONER FISHER:**  --

25    hearing.

26         **DEPUTY COMMISSIONER MEJIA:**  -- was a doc

27    hearing.

8

1       **PRESIDING COMMISSIONER FISHER:**  That was

2  your -- That was your doc hearing.

3       **INMATE GREEN:**  Okay.

4       **PRESIDING COMMISSIONER FISHER:**  That

5  wasn't a parole hearing.

6       **INMATE GREEN:**  Then that was the last doc

7  hearing.

8       **PRESIDING COMMISSIONER FISHER:**  That was

9  just to kind of tell you what you should be

10  doing.

11       **INMATE GREEN:**  Okay.

12       **PRESIDING COMMISSIONER FISHER:**  Yeah.

13       **INMATE GREEN:**  That was in '98.

14       **PRESIDING COMMISSIONER FISHER:**  Yeah,

15  that wasn't a parole hearing.

16       **INMATE GREEN:**  Then after that I had the

17  hearing.

18       **PRESIDING COMMISSIONER FISHER:**  Okay.  So

19  your last hearing was February --

20       **DEPUTY COMMISSIONER MEJIA:**  Two thousand

21  two.

22       **PRESIDING COMMISSIONER FISHER:**  -- yeah,

23  20, 2002.

24       **DEPUTY COMMISSIONER MEJIA:**  First

25  subsequent is right.

26       **PRESIDING COMMISSIONER FISHER:**  Okay.

27  Let me just get back here.  Is there anything

9

1    I'm missing off of here?

2         **DEPUTY COMMISSIONER MEJIA:**  That's the

3    128(a), that's the 115.

4         **PRESIDING COMMISSIONER FISHER:**  Okay.

5    Yeah, I am missing something.  Okay.  Thank you.

6    Okay.  For one thing, you asked about what, you

7    know, what the criteria were and what you needed

8    to do to be suitable.  And before we get into

9    the middle of things here, I want to ask you

10   about the fact that you had -- you had two 115's

11   since your last hearing.

12        **INMATE GREEN:**  Yeah, three years ago.

13        **PRESIDING COMMISSIONER FISHER:**  Okay.

14        **INMATE GREEN:**  It's been three years ago

15   since I had those 115's.  I have been

16   disciplinary-free these last -- since then.

17        **PRESIDING COMMISSIONER FISHER:**  Okay.

18   You know that's not a very significant amount of

19   time for a lifer?

20        **INMATE GREEN:**  What, for a 115?  For not

21   -- What was that, for refusing to

22   (indiscernible) work because I was sick?

23        **PRESIDING COMMISSIONER FISHER:**  For

24   obeying orders in May of '92.

25        **INMATE GREEN:**  No.  It was refusing to

26   work I think it was.

27        **PRESIDING COMMISSIONER FISHER:**  Well I'll

10

1    tell you what.

2        INMATE GREEN:  As a matter of fact, it

3    was -- had something to do with I think the

4    telephone or something in the wing, yeah, at

5    Pleasant Valley.

6        PRESIDING COMMISSIONER FISHER:  Okay.

7    And we'll go through that when we go through

8    your hearing.  You asked me, you said that you

9    were trying to figure out what you needed to do.

10   You need to stay disciplinary-free.

11       INMATE GREEN:  I've been

12   disciplinary-free.

13       PRESIDING COMMISSIONER FISHER:  For a

14   significant period of time.  And I can tell you

15   that having gotten a 115 from your last hearing

16   is going to be considered one of the factors of

17   unsuitability at this hearing.  It always is.

18       INMATE GREEN:  But it seems like every

19   time I'm coming to the Board hearing it's always

20   another write-up or another disciplinary action

21   that's going on.

22       PRESIDING COMMISSIONER FISHER:  Well we

23   don't have any control over that.  Only you have

24   control over that.

25       INMATE GREEN:  Well I don't have no

26   control over that in this type of environment

27   that (indiscernible).

11

1        **PRESIDING COMMISSIONER FISHER:**  Sure you

2   do.  We see guys everyday who have never had a

3   115.

4        **INMATE GREEN:**  But I'm not those guys.

5        **PRESIDING COMMISSIONER FISHER:**  We had a

6   guy in here yesterday that never had one 115.

7   And I'm telling you -- You're asking me what you

8   need to do to be found suitable and I'm telling

9   you the truth.  You've got to remain

10  disciplinary-free for a long period of time.

11       **INMATE GREEN:**  So you're telling me --

12       **PRESIDING COMMISSIONER FISHER:**  You can

13  argue with me about it --

14       **INMATE GREEN:**  I'm not trying to argue

15  with you.

16       **PRESIDING COMMISSIONER FISHER:**  But it's

17  not going to change the facts.  The facts are

18  that this Panel -- this Board, not just this

19  Panel, but this Board in general has been giving

20  more grants than any Board in recent history.

21  And we're seeing what the Governor's sending

22  back.  And I usually look for 10 years of

23  disciplinary-free behavior if everything else

24  has fallen to place.  And the Governor's sending

25  those back.

26       **INMATE GREEN:**  So what does that have to

27  do with my earliest possible release date?

12

1          **PRESIDING COMMISSIONER FISHER:**  It has

2   nothing to do with it.  Our job is to find you

3   suitable for parole.  That means that we have --

4   we have to feel that the program that you've

5   done is good.  That you've gained insight.  We

6   have to feel comfortable that you've been

7   disciplinary-free long enough for us to feel

8   like if you're out in society and there's a rule

9   that you should follow or a law that you should

10  follow that you don't like that you're going to

11  follow it anyway because you need to.  We have

12  to look at the criteria that make you suitable

13  for parole, balance them against the criteria

14  that make you unsuitable for parole and decide

15  that we don't think that you're a risk to

16  society.  It doesn't have anything to do with

17  your minimum eligible parole date.  That doesn't

18  even come into play until you're found suitable

19  for parole.

20          **INMATE GREEN:**  So a lot of the good

21  things that I have done means nothing compared

22  to a 115?

23          **PRESIDING COMMISSIONER FISHER:**  That's

24  not what I just said.  I said -- I said we have

25  to balance the bad against the good.  And I'm

26  just telling you upfront before we get started,

27  because you're representing yourself and I don't

13

1  want you to be at any kind of a disadvantage in

2  doing that, that a 115 is considered to be a

3  factor of unsuitability.  If you feel like the

4  good that you've done balances those two 115's

5  that you've had since your last Board hearing,

6  then I think that you should -- you should go

7  forward.  I just -- I just am telling -- I'm

8  trying to be as straight with you as I can

9  because I don't want you to represent yourself

10  at any kind of a disadvantage and feel like you

11  didn't get a fair shake.

12       **INMATE GREEN:**  Well like I said, I've

13  been -- this is my second time here.  And I got

14  denied three years last time.  I wasn't

15  representing myself.

16       **PRESIDING COMMISSIONER FISHER:**  A three

17  year denial on an initial hearing is not

18  unusual.

19       **INMATE GREEN:**  Well like you know, it's

20  just I'm trying to find out what kind of

21  guidelines on doing my prison sentence

22  (indiscernible).

23       **PRESIDING COMMISSIONER FISHER:**  And

24  that's what I --

25       **INMATE GREEN:**  Because it seems like

26  every time I'm coming to the Board hearing my

27  date started from way back in 19 -- this said on

14

1   here that I was supposed to have been eligible

2   for parole since '98 on this paper here.  But

3   this is 2005.  I'm still in prison.

4           PRESIDING COMMISSIONER FISHER:  No, the

5   minimum eligible date on the paperwork here is

6   in '02.  And it doesn't matter.

7           INMATE GREEN:  But here it says '98.

8           PRESIDING COMMISSIONER FISHER:

9   Mr. Green, it doesn't matter.  You don't get --

10  You don't get an automatic out just because your

11  minimum eligible parole date comes around.  You

12  have to be found suitable for parole.

13          INMATE GREEN:  I haven't --

14          PRESIDING COMMISSIONER FISHER:  Even once

15  you've done your minimum eligible parole date,

16  according to -- based on the matrix you probably

17  would have some more time left to do.

18          INMATE GREEN:  But I haven't -- I haven't

19  caught --

20          PRESIDING COMMISSIONER FISHER:  And

21  that's --

22          INMATE GREEN:  -- no more time.

23          PRESIDING COMMISSIONER FISHER:  And

24  that's why I'm asking you about this stuff

25  because it's not -- it's not --

26          DEPUTY COMMISSIONER MEJIA:

27  (Indiscernible).

15

1    PRESIDING COMMISSIONER FISHER:  It's not

2    just cut and dry, as simple -- it's your minimum

3    eligible date, therefore, you, you know, get out

4    jail and go home.  There are -- There are

5    factors of suitability and unsuitability.  There

6    are factors of suitability and unsuitability in

7    the Penal Code, in Title XV.  And we have to

8    deal with those.  And then we look at your

9    minimum eligible parole date.  So I'm just

10   suggesting to you, I don't know if you want --

11   if you want to think about having an attorney

12   assigned to you.

13        INMATE GREEN:  No, I don't.

14        PRESIDING COMMISSIONER FISHER:  You want

15   to go ahead -- You just want to --

16        INMATE GREEN:  It's not going to make no

17   difference because an attorney's not going to

18   give me no more than what I have right here.

19        PRESIDING COMMISSIONER FISHER:  Okay.

20   All right.  Should we go ahead and go forward?

21        INMATE GREEN:  Yes, Ma'am.

22        PRESIDING COMMISSIONER FISHER:  Okay.

23   And you feel comfortable that you have

24   everything there you need?

25        INMATE GREEN:  Yes, Ma'am.

26        PRESIDING COMMISSIONER FISHER:  All

27   right.  Let's do it then.  Okay.  This hearing

16

```
 1    is being conducted pursuant to Penal Code
 2    Sections 3041 and 3042, and the rules and
 3    regulations of the Board of Prison Terms that
 4    govern parole consideration hearings for life
 5    inmates.  And I know that you're aware of this,
 6    Mr. Green, that the purpose of the hearing is to
 7    consider your commitment offense, your criminal
 8    and social history and your behavior and
 9    programming since you've been in prison for this
10    offense.  We have -- We have reviewed your file.
11    And of course, we're going to give you the
12    opportunity to make any corrections that you
13    need to today such as the thing that you pointed
14    out to us here.  We're going to reach a decision
15    today as to whether or not we find you suitable.
16    If we do find you suitable, I'll explain to you
17    today how much longer you'll be in prison.
18    Before we recess to deliberate, I am going to
19    give you and Mr. Higgins both an opportunity to
20    make a statement about your suitability.  I want
21    to remind you that you're not required to admit
22    or discuss the offense, but that the Panel
23    accepts the findings of the court to be true.
24    Do you understand that?
25            INMATE GREEN:  Yes, Ma'am.
26            PRESIDING COMMISSIONER FISHER:  Okay.
27    The California Code of Regulations states that
```

17

1  regardless of time served a life inmate shall be

2  found unsuitable for and denied parole if in the

3  judgment of the Panel he would pose an

4  unreasonable risk of danger to society or a

5  threat to public safety.  You have rights that

6  are related to your hearing.  They include the

7  right to a timely notice of the hearing, the

8  right to review your Central File and the right

9  to present relevant document.  Do you feel that

10  those rights been met?

11        INMATE GREEN:  Yes.

12        PRESIDING COMMISSIONER FISHER:  Okay.

13  You also have the right to an impartial Panel.

14  Now that you've seen the two of us today, do you

15  have any objections to your Panel?

16        INMATE GREEN:  No, Ma'am.

17        PRESIDING COMMISSIONER FISHER:  Okay.

18  I'm going to give you a written copy of our

19  decision today.  It's tentative.  So it'll be

20  effective within 120 days.  And then a copy of

21  the decision and a copy of the transcript of

22  this hearing will be sent to you.  Okay.

23        INMATE GREEN:  Yes.

24        PRESIDING COMMISSIONER FISHER:  Now.  I

25  know that you -- I think I saw that you had done

26  an appeal but I'm not sure when it was.  So it

27  looks like maybe it was before they changed the

18

1   process.  The new process is that everything

2   goes directly to the courts.  So if you need any

3   information about that, your correctional

4   counselor should have it.  And also, it should

5   be in the prison library.  Okay.

6        INMATE GREEN:  Okay.

7        PRESIDING COMMISSIONER FISHER:  Excuse

8   me.  Is there anything that we don't have in the

9   way of certificates or letters of support that

10  you need to submit to us?

11       INMATE GREEN:  Yes.  Because going by

12  this right here, I don't see nothing really -- I

13  see one letter.

14       PRESIDING COMMISSIONER FISHER:  Okay.

15       INMATE GREEN:  But I have a lot of --

16       PRESIDING COMMISSIONER FISHER:  Okay.

17  Yeah, just give --

18       INMATE GREEN:  I have a lot of letters.

19       PRESIDING COMMISSIONER FISHER:  -- them

20  to the officer and he'll hand them over to me.

21       INMATE GREEN:  Okay.

22       PRESIDING COMMISSIONER FISHER:  And if

23  there's anything that we miss as we go through

24  things, be sure to let us know.  Okay.  I have a

25  few letters in the file here it looks like.

26       INMATE GREEN:  Okay.  These are all

27  support letters here.

19

1          PRESIDING COMMISSIONER FISHER:  Okay.

2          INMATE GREEN:  This is the letter from

3    the Eman here at Soledad.  These are all of my

4    certificates.  Anger Management, Fatherhood --

5          DEPUTY COMMISSIONER MEJIA:

6    (Indiscernible).

7          INMATE GREEN:  -- certificates.

8          PRESIDING COMMISSIONER FISHER:  Okay.

9          INMATE GREEN:  And other educational

10   schooling that I'm doing here on the video

11   reports and a Fatherhood chrono.

12         PRESIDING COMMISSIONER FISHER:  Okay.

13         INMATE GREEN:  Leadership chrono.

14         PRESIDING COMMISSIONER FISHER:  And

15   during the second half of the hearing

16   Commissioner Mejia's going to go through all

17   your certificates with you.  So if there's

18   anything missing, you can let him know.  All

19   right.

20         INMATE GREEN:  Yeah.  Those are just

21   updated ones there.

22         PRESIDING COMMISSIONER FISHER:  All

23   right.

24         INMATE GREEN:  All of the rest of them

25   should be on file.

26         PRESIDING COMMISSIONER FISHER:  Okay.  If

27   as we go -- Like I said, as we're going through,

20

1    if there's anything you have that we don't, just

2    let us know.

3            INMATE GREEN:  Did I put the Midas --

4    here, this is for a job.

5            PRESIDING COMMISSIONER FISHER:  Okay.

6            INMATE GREEN:  The job offer, Midas

7    Trucking Company there.

8            PRESIDING COMMISSIONER FISHER:  Okay.

9    All right.

10           INMATE GREEN:  That's about it.

11           PRESIDING COMMISSIONER FISHER:  Okay.  Do

12   you have any preliminary objections that you

13   need to make before we get started?

14           INMATE GREEN:  Well, no, other than this

15   counselor's report is not correct.

16           PRESIDING COMMISSIONER FISHER:  Okay.

17           INMATE GREEN:  So I'd appreciate it if we

18   really --

19           PRESIDING COMMISSIONER FISHER:  We will.

20   We'll go through that.  We're going to go

21   through that in detail.  Okay.  And are you

22   going to be talking about the crime today?

23           INMATE GREEN:  No.

24           PRESIDING COMMISSIONER FISHER:  Okay.

25   Then what I'm going to do is swear you in for

26   other questions that we have for you.  Okay.

27           INMATE GREEN:  Okay.

21

1     **PRESIDING COMMISSIONER FISHER:**

2     (Indiscernible) raise your right hand.  Do you

3     solemnly swear or affirm that the testimony you

4     give at this hearing will be the truth and

5     nothing but the truth?

6     **INMATE GREEN:**  Yes, Ma'am.

7     **PRESIDING COMMISSIONER FISHER:**  Okay.

8     Thank you.  What I'm going to do, Mr. Green, is

9     read a summary of the crime into the record.

10    And then since we're not going to be asking you

11    questions about it, I'm going to read -- let's

12    see where is it here -- the review of the life

13    crime from the psych evaluation if you feel like

14    that's correct as far your version goes.  It

15    would be the --

16    **INMATE GREEN:**  Is that the last psych

17    report?

18    **PRESIDING COMMISSIONER FISHER:**  Yeah, the

19    one in October of '05.  It's on page two at the

20    bottom of the page and it's called review of

21    life crime.

22    **INMATE GREEN:**  Okay.  Review of life

23    crime.  Bottom of what page?

24    **PRESIDING COMMISSIONER FISHER:**  Bottom of

25    page two.

26    **INMATE GREEN:**  Page two.  Okay.

27    **PRESIDING COMMISSIONER FISHER:**  The title

23

```
 1    Gomez.  So I'm using the offense summary for the
 2    record also.  And it says:
 3              "Per probation officer's report,
 4              pages two through four, and page
 5              two of Second Appellate District
 6              Court of Appeal decision, on a
 7              Tuesday night in February 1988
 8              believed to be February 23, 1988
 9              around 11:00 p.m. witness Albert
10              C. Johnson was at the home of a
11              friend known by the name of Ski
12              Jump and in parentheses it says
13              (Green) who he had known for 13
14              years.  Johnson observed defendant
15              carrying an automatic rifle with
16              an attachable bayonet.  He also
17              saw the prisoner attach the
18              bayonet.  By the time he observed
19              Green and the victim Delano L.
20              Reed, that's D-E-L-A-N-O last name
21              R-E-E-D -- wait a minute.  I think
22              I missed an entire -- the time he
23              observed Green -- the time he
24              observed Green and the victim
25              Delano L. Reed arguing and Green
26              getting more upset as he accused
27              Reed of stealing cocaine from him.
```

22

1    is review of life crime.

2         INMATE GREEN:  Yes.

3         PRESIDING COMMISSIONER FISHER:  Does that

4    -- If you kind of glance through that and let me

5    know if that looks correct, we'll use that one

6    for the record.

7         DEPUTY DISTRICT ATTORNEY HIGGINS:   I

8    would like to comment because I don't think it's

9    an accurate (indiscernible).  I don't know how

10   --

11        PRESIDING COMMISSIONER FISHER:  Well it's

12   his view.  So that's why I'm asking if it's

13   accurate according to his view.  Okay.  I'm

14   going to read the other summary also from the

15   probation officer's report.  Does that look

16   right as far as your perspective?

17        INMATE GREEN:  Yes.

18        PRESIDING COMMISSIONER FISHER:  Okay.  Is

19   that the one I should use?

20        INMATE GREEN:  Yes.

21        PRESIDING COMMISSIONER FISHER:  Okay.

22   Good.  All right.  I'm going to use -- For the

23   summary of the crime I'm going to use the

24   current -- I don't know if it is the current,

25   let's see here, where the heck's the date on

26   this thing.  It's the Board report.  It's from

27   Pleasant Valley and it is dated 7-30-01 by

24

1       In Johnson's presence, Green shot

2       Reed in the upper thigh of his

3       left leg.  When Johnson stood up,

4       Green pointed the rifle at him and

5       told him to sit down.  While Reed

6       was sitting on the floor bleeding

7       and begging to go to the hospital,

8       Green watched over him, gun in

9       hand, telling him to shut up.

10      Green also pointed the gun at

11      Johnson and kept him from leaving

12      the location.  Subsequently, Green

13      let Johnson leave.  However, he

14      put the gun to Johnson's back and

15      told him if he ever said anything

16      about what happened he would get

17      him.  Therefore, Johnson did not

18      come forward even after he learned

19      of Reed's death because he was

20      afraid of Green.  He did not tell

21      what happened until contacted by

22      the police.  When Johnson last saw

23      Reed alive, he was (indiscernible)

24      on the prisoner's floor bleeding

25      profusely with Green standing over

26      him armed.  On Thursday,

27      February 25, 1989 at approximately

25

```
 1          4:15 p.m., a bicyclist discovered
 2          Reed's body dumped in a remote
 3          park off (indiscernible).  The
 4          autopsy report revealed Reed
 5          suffered two gunshot wounds to his
 6          legs and stab wounds to the upper
 7          leg.  The cause of death was a
 8          gunshot wound, which severed the
 9          femur artery and fractured the
10          femora.  Finally, on October 17,
11          1989 officers obtained a search
12          warrant and searched Green's
13          house.  They found evidence of
14          blood in the area of the carpet
15          Johnson's described.  Based on the
16          aforementioned and observation,
17          the prisoner was arrested."
18  And then under -- let me finish.  Under review
19  of life crime, this is on page two of the
20  October 1, '05 psych report, it says:
21          "The circumstances of the
22          commitment offense were reviewed.
23          Inmate Green repeated what
24          happened and this is well
25          documented in prior psychological
26          evaluations therefore -- "
27  Well, this may not be enough detail.  Let's go
```

26

1   back (indiscernible) he says there's more detail

2   if you think that one's correct.  I -- realized

3   that he stopped short.  Okay.  The one that he

4   refers back to I'm going to use that one instead

5   because it's got more detail from you.  Okay.

6         INMATE GREEN:  What page is that?

7         PRESIDING COMMISSIONER FISHER:  It's the

8   -- It's the report that's the one directly

9   behind that one.  It's on page six of that next

10  report.  In the middle of the page it says

11  review of life crime.  This one's the one dated

12  8-9-01.  It's my Judy Dietsch (phonetic) I think

13  her name is.  Do you see where I'm talking

14  about?

15        INMATE GREEN:  Yes.

16        PRESIDING COMMISSIONER FISHER:  Okay.  Is

17  that one all right?  Looks like you --

18        INMATE GREEN:  You said right here where

19  it says according to the probation officer's

20  report from Los Angeles County dated --

21        PRESIDING COMMISSIONER FISHER:  Uh-hmm.

22        INMATE GREEN:  Yes.  Review of life

23  crime?

24        PRESIDING COMMISSIONER FISHER:  Yeah.

25  Because it looks like you gave more detail to

26  the doctor in this one and the last doctor

27  referred back to it.  So we'll use that instead.

27

1    All right.  And I'm going to start with the

2    second paragraph where you start talking.

3              **INMATE GREEN:**  Yes.  That's where

4    (indiscernible).

5              **PRESIDING COMMISSIONER FISHER:**  Okay.  It

6    says:

7              "Mr. Green stated, the way it went

8              down, I'm guilty even though I

9              said I was innocent.  He stated it

10             was a robbery that went bad.  They

11             came to rob me.  They had on

12             stocking masks.  There were not

13             just two people but at least three

14             in the house and another one in

15             the car.  Mr. Green stated that

16             they came to rob him due to the

17             fact that he had money and drugs

18             and a shootout occurred.  He

19             stated that the witness might have

20             also been shot.  Mr. Green states

21             that he did have a gun and did

22             shoot two people.  He stated that

23             they ran out of his home and got

24             into a car.  He stated in fact

25             that one of them went through the

26             front window.  Mr. Green stated he

27             was pretty sure that the victim

28

1   was not the only one shot.  He
2   stated they were shooting at him
3   and there were a lot of gunshot
4   holes in the walls.  He stated
5   that when the police were
6   investigating this crime, the
7   stepson of the witness stated that
8   the witness had told him that he
9   had killed the victim not inmate
10  Green.  Green stated, if I knew
11  the law like I know it now, I
12  would have told the truth about it
13  from the beginning.  My story was
14  that I'm innocent (indiscernible)
15  guilty of shooting the guy.  My
16  gun shot him.  I don't really know
17  who I shot due to the fact that
18  they had on stocking masks.  Green
19  went on to say, I'm doing this
20  time for everyone else.  They said
21  I shot my little brother, but
22  there was not proof that it was a
23  bullet from my gun.  My brother
24  testified that someone else shot
25  him.  He stated that some Mexicans
26  in the neighborhood shot him
27  because he didn't know what to say

```
1        -- I'm sorry -- he didn't want to
2        say that he was in the shootout.
3        Mr. Green stated that he did not
4        know the witness very well, but
5        that he'd known the victim for a
6        long time.  He stated he
7        questioned why they would rob him
8        because they were friends and
9        Mr. Green had helped the victim in
10       the past.  Mr. Green stated that
11       he did not find out that the
12       victim was a friend of his until
13       much later.  Mr. Green also stated
14       that the victim and the witness
15       were known in the neighborhood for
16       committing home invasions.
17       Mr. Green's mental condition did
18       not appear to impact this crime.
19       He did state that he was wrong for
20       being involved in the mundane and
21       profane situation like that.  He
22       stated that he felt remorseful
23       that someone lost his life.  He
24       stated that he hurt me to find out
25       it was them who came to rob me.  I
26       pray God will forgive me.  I
27       caused hurt to the victim and his
```

30

1              family.  Mr. Green also stated

2              that he initially said he was

3              innocent due to the fact I was

4              young, I'm dumb and I'm going to

5              beat this case.  Mr. Green stated

6              that drugs and money were the

7              bottom line causes of his crime.

8              He stated that after this offense

9              he started using drugs very

10             heavily but ultimately it made him

11             want to change and stop abusing

12             drugs.  He stated, I wasn't

13             thinking.  It also appears that

14             Mr. Green's involvement in gang

15             related activities and drug

16             activities placed him in

17             situations where these crimes were

18             likely to occur."

19     Okay.  We're not going to be asking you any

20     questions about the crime.  So unless you have

21     anything that you want to comment on, we'll just

22     move on.

23             INMATE GREEN:  No.

24             PRESIDING COMMISSIONER FISHER:  All

25     right.  Okay.  Let's see here.

26             DEPUTY DISTRICT ATTORNEY HIGGINS:  Excuse

27     me.  I'm not quite sure of the procedures here.

31

1    I think with both the Statement of Facts by the

2    counselor and by Mr. Green it is still

3    incomplete as evidenced by the probation report

4    and the Appellate decision (indiscernible) --

5          PRESIDING COMMISSIONER FISHER:  And we're

6    going to be -- And we're going to be reviewing

7    both the probation report and the Appellate

8    decision during deliberation.  I, just for the

9    purpose of getting information on the record,

10   needed to read something into the record.  The

11   probation report and the Appellate decision were

12   both pretty lengthy.  So we'll go through the

13   facts of those also.  And basically the process

14   is that I'll go through some information with

15   him.  And then Mr. Mejia will go through the

16   file.  And then all three of us will have the --

17   Well, no, we can't ask questions about the

18   crime.  We won't have the opportunity to ask him

19   questions about the crime because he's not

20   talking about the crime today.  But questions

21   about other things will be allowed.  And then

22   once we've finished that, you can make a final

23   statement.  And at that time you can bring in

24   any information --

25         DEPUTY DISTRICT ATTORNEY HIGGINS:

26   (Indiscernible) --

27         PRESIDING COMMISSIONER FISHER:  I'm

32

1  sorry.  I'm sorry.

2      **DEPUTY DISTRICT ATTORNEY HIGGINS:**  --

3  catch up on the procedure.

4      **PRESIDING COMMISSIONER FISHER:**  When you

5  said I don't know what the process is, I assumed

6  that you had --

7      **DEPUTY DISTRICT ATTORNEY HIGGINS:**  I just

8  hadn't done (indiscernible) for a long time.

9      **PRESIDING COMMISSIONER FISHER:**  Okay.

10  All right.  We have a lot of new attorneys

11  coming in who haven't ever done it before.  So

12  I've gotten into teaching mode.

13      **DEPUTY DISTRICT ATTORNEY HIGGINS:**

14  (Indiscernible).

15      **PRESIDING COMMISSIONER FISHER:**  Sorry.

16      **DEPUTY DISTRICT ATTORNEY HIGGINS:**  No

17  problem.

18      **PRESIDING COMMISSIONER FISHER:**  Okay.

19  Now that I've offended everyone in the room.

20      **DEPUTY DISTRICT ATTORNEY HIGGINS:**

21  (Indiscernible).

22      **PRESIDING COMMISSIONER FISHER:**  All

23  right.  Mr. Green, I'm going to go through your

24  prior criminal history with you.  Okay.  And I'm

25  just looking at the Board report.  So I'm going

26  to ask you to kind of fill in the gaps for me

27  here.  All right.

33

1        **INMATE GREEN:**  Priors of what?

2        **PRESIDING COMMISSIONER FISHER:**  Your

3  prior criminal history.

4        **INMATE GREEN:**  Prior criminal history?

5        **PRESIDING COMMISSIONER FISHER:**  It should

6  be in the -- It's in the Board report.

7        **INMATE GREEN:**  The Board report, prior

8  criminal history, let me see where we're at.

9        **PRESIDING COMMISSIONER FISHER:**  It's

10  under pre-conviction factors.

11        **DEPUTY COMMISSIONER MEJIA:**  The first tab

12  that you have there in your packet.

13        **PRESIDING COMMISSIONER FISHER:**  Yeah,

14  it's under the first tab, the first --

15        **INMATE GREEN:**  Right here?

16        **DEPUTY COMMISSIONER MEJIA:**  Yeah.

17        **PRESIDING COMMISSIONER FISHER:**  Uh-hmm.

18        **INMATE GREEN:**  This, okay.  This one

19  here?  No.

20        **DEPUTY COMMISSIONER MEJIA:**  Yeah, go up.

21  There's some more in there.  This will tell you

22  about your rap sheet too.  Okay.  Are you

23  looking at the Board report then?

24        **PRESIDING COMMISSIONER FISHER:**  Yeah.

25        **DEPUTY COMMISSIONER MEJIA:**  The Board

26  report will be the second tab on your Board

27  report.

34

1          **PRESIDING COMMISSIONER FISHER:**  Yeah, the

2    second tab.

3          **INMATE GREEN:**  Okay.

4          **DEPUTY COMMISSIONER MEJIA:**  Okay.

5    (Indiscernible) your criminal history.

6          **PRESIDING COMMISSIONER FISHER:**  And the

7    most recent report refers us back to the last --

8    to the report before it.  So the report that

9    we're using is the one from -- let's see here.

10   I don't know why they didn't put a date on this

11   thing.  It's from '01.  It's from 2001 and it's

12   by Mr. Gomez or Ms. Gomez, whichever.  And it's

13   on page two of that report.

14         **INMATE GREEN:**  Two thousand one.

15         **PRESIDING COMMISSIONER FISHER:**  Yeah,

16   it's a ways back, it's a few pages back.  So

17   just keep flipping.

18         **INMATE GREEN:**  Post-conviction right

19   here, this it?

20         **PRESIDING COMMISSIONER FISHER:**  Yep.

21   Pre-conviction is what we're looking for.  Do

22   you see pre-conviction?  It looks like this.

23         **DEPUTY COMMISSIONER MEJIA:**  Before that.

24         **PRESIDING COMMISSIONER FISHER:**  It looks

25   like this.

26         **INMATE GREEN:**  Yeah.

27         **PRESIDING COMMISSIONER FISHER:**  Okay.

35

1   All right.

2        INMATE GREEN:  Pre-conviction factors.

3        PRESIDING COMMISSIONER FISHER:  Okay.  So

4   starting in 1984 it says there's no juvenile

5   history, no juvenile record of convictions.

6   Starting in 1984 in December and through 1989

7   you had four -- five arrests.  How old were you

8   in 1984?

9        INMATE GREEN:  Nineteen '84 I must -- I

10   think I was around 18, 19.

11        PRESIDING COMMISSIONER FISHER:  Okay.

12        INMATE GREEN:  (Indiscernible).

13        PRESIDING COMMISSIONER FISHER:  This one

14   was for possession of a dangerous weapon.  Do

15   you remember what the case was?

16        INMATE GREEN:  Nineteen '84, convicted,

17   18 months probation, possession of a dangerous

18   weapon.  I believe it was a pocketknife.

19        PRESIDING COMMISSIONER FISHER:  Okay.

20   And you did 18 months probation for that?

21        INMATE GREEN:  Yes.

22        PRESIDING COMMISSIONER FISHER:

23   (Indiscernible) one was dismissed, possession of

24   a switchblade, that one was another conviction,

25   a misdemeanor.  False I.D. to a peace officer

26   and grand theft auto which was dismissed.  Says

27   in that particular case you were convicted of

36

1    taking a vehicle without the owner's consent.

2    Did you actually do the 30 days in jail?

3            INMATE GREEN:  Yes.

4            PRESIDING COMMISSIONER FISHER:  Okay.

5    Whose car was it?

6            INMATE GREEN:  It was a rent a car from

7    Burbank -- what do they call that --

8            PRESIDING COMMISSIONER FISHER:  What

9    happened?

10           INMATE GREEN:  -- Burbank rent -- It was

11   a rent a car from some place in Burbank

12   (indiscernible).

13           PRESIDING COMMISSIONER FISHER:  Did you

14   not -- Did you not take it back, is that what

15   happened?

16           INMATE GREEN:  Well somebody had rented

17   the car and they wasn't paying on it.  I was

18   driving the car and got pulled over in the car.

19           PRESIDING COMMISSIONER FISHER:  Okay.

20   Did you --

21           INMATE GREEN:  Budget Rent A Car

22   (indiscernible).

23           PRESIDING COMMISSIONER FISHER:  Okay.  So

24   you were dealing -- Were you dealing drugs at

25   the time of these arrests?

26           INMATE GREEN:  Well, no.  Wait, let me

27   see.  In '88, mainly '88.  All the arrests

37

1    during '88 I was hanging in a lot of negative

2    areas then.

3            PRESIDING COMMISSIONER FISHER:  Okay.

4            INMATE GREEN:  Like the time they caught

5    me with the switchblade on me that was in August

6    '88.  I remember that.  That was in Carson.

7            PRESIDING COMMISSIONER FISHER:  Okay.

8            INMATE GREEN:  But '85 I was working.  I

9    had a good job then.  That's why I never really

10   -- they let me -- They let me out, '84 and '85.

11   Both of those -- Those two convictions right

12   there, I didn't do really no time --

13           PRESIDING COMMISSIONER FISHER:  Okay.

14           INMATE GREEN:  -- in jail.

15           PRESIDING COMMISSIONER FISHER:  All

16   right.

17           INMATE GREEN:  I was working those times.

18           PRESIDING COMMISSIONER FISHER:  Okay.

19   Let's go through your social history a little

20   bit.  Just kind of life before you came to

21   prison for this crime.  I'll tell you what I've

22   got here.  You can let me know if it's correct.

23   All right.  All right.  Let's see here.  It says

24   you were born in Compton.  Raised by your mom

25   and your grandfather until 1987.  Is that right?

26           INMATE GREEN:  Where you at now?

27           PRESIDING COMMISSIONER FISHER:  I'm in

38

1    the -- I'm under psychological evaluations.  I'm

2    looking at page two of the --

3          **INMATE GREEN:**  Okay.  Yeah.

4          **PRESIDING COMMISSIONER FISHER:**  Okay.

5    And it's under -- The one that I'm looking --

6          **INMATE GREEN:**  Family history?

7          **PRESIDING COMMISSIONER FISHER:**  Family

8    history, yeah.  And let's see here.  So at this

9    time this was -- this was a couple of years ago.

10   Is your mom still alive?

11         **INMATE GREEN:**  Yes.

12         **PRESIDING COMMISSIONER FISHER:**  Okay.

13   Are you still in contact with her?

14         **INMATE GREEN:**  Yes, but she's really in

15   bad health.  She just came to see me around two

16   weeks ago.

17         **PRESIDING COMMISSIONER FISHER:**  Really.

18         **INMATE GREEN:**  Came up and visit.

19         **PRESIDING COMMISSIONER FISHER:**  What's

20   wrong with her health?

21         **INMATE GREEN:**  She's having just a lot of

22   -- what's the -- She had a hysterectomy or

23   something.  Osteoporosis.  Her spine and stuff

24   messed up.  Her health is not just too good

25   right now.

26         **PRESIDING COMMISSIONER FISHER:**  That's

27   too bad.  She's pretty young for that.  It says

39

1  here that you have nine brothers and sisters.

2          INMATE GREEN:  Yeah, on my father's side.

3          PRESIDING COMMISSIONER FISHER:  Okay.

4          INMATE GREEN:  I have -- Most of my

5  family's on my father's side

6          PRESIDING COMMISSIONER FISHER:  Okay.

7  Are all of them still alive?

8          INMATE GREEN:  Yes.

9          PRESIDING COMMISSIONER FISHER:  Okay.

10  And what about them?  Are you in contact with

11  them?

12          INMATE GREEN:  Well off and on.  I don't

13  hardly communicate with them like I used to.

14          PRESIDING COMMISSIONER FISHER:  Okay.

15          INMATE GREEN:  Too much.

16          PRESIDING COMMISSIONER FISHER:  It says

17  you went to the twelfth grade but you didn't

18  graduate.  Is that right?

19          INMATE GREEN:  Yes.

20          PRESIDING COMMISSIONER FISHER:  So you

21  were just a few credits short.  But you said

22  that you've gotten your GED since you were here,

23  right?

24          INMATE GREEN:  Yes, I got my GED in '98.

25          PRESIDING COMMISSIONER FISHER:  Okay.

26          INMATE GREEN:  Ironwood.

27          PRESIDING COMMISSIONER FISHER:  Okay.

40

1   Never been married?

2       INMATE GREEN:  No.  But I've been

3   involved with serious relationships but never

4   married.

5       PRESIDING COMMISSIONER FISHER:  How many

6   children do you have?  I'm looking at this but I

7   haven't figured it out yet.

8       INMATE GREEN:  Well, I have two daughters

9   that I know that are mine.  And I have kids that

10  I've raised.

11      PRESIDING COMMISSIONER FISHER:  Okay.

12      INMATE GREEN:  Like from Melanie, you'll

13  see on another report when I first came to

14  prison I was -- As a matter of fact, it's right

15  here on this report.  Marital status it says

16  Melanie Roughen (phonetic).  She had three sons.

17  And I was raising those three and my two

18  daughters.  All my kids grown now though.  They

19  was babies when I came --

20      PRESIDING COMMISSIONER FISHER:  How in

21  the world were you --

22      INMATE GREEN:  -- to prison.

23      PRESIDING COMMISSIONER FISHER:  --

24  raising them?  Were you living with her?

25      INMATE GREEN:  Yes.

26      PRESIDING COMMISSIONER FISHER:  What does

27  it mean that you said that you were cheating on

41

1  your two previous girlfriends with a woman named

2  Melanie Roughen?

3       INMATE GREEN:  Well all of them was my

4  girlfriends at the time.  I was cheating on all

5  of them.

6       PRESIDING COMMISSIONER FISHER:  That was

7  a great example for the boys.

8       INMATE GREEN:  To tell you the truth,

9  well, you know, I wasn't married and I was out

10  there being a little player back then.

11       PRESIDING COMMISSIONER FISHER:  Were you

12  supporting them financially?

13       INMATE GREEN:  Well, yes, I had a nice

14  job working at landscaping.  Had a landscaping

15  business.

16       PRESIDING COMMISSIONER FISHER:  What

17  about your daughters?  Were you supporting them

18  financially?

19       INMATE GREEN:  Yes.

20       PRESIDING COMMISSIONER FISHER:  Okay.

21  And what about your kids?  Are you in contact

22  with your kids?

23       INMATE GREEN:  Yes.  They're all grown

24  now.

25       PRESIDING COMMISSIONER FISHER:  Okay.

26  How are they doing?

27       INMATE GREEN:  They're doing all right.

42

1    I write them and talk to them on the phone

2    pretty regular.

3            PRESIDING COMMISSIONER FISHER:  Okay.

4    Now rather than me just read about your

5    substance abuse history into the record why

6    don't you tell me about it?  When you started

7    using drugs, what you started using and kind of

8    how it evolved.

9            INMATE GREEN:  It was so long ago I can't

10   really tell you too much about that no more.

11   See I've been -- I haven't used drugs in over 18

12   -- since I've been in prison.  Or used alcohol,

13   none of that.

14           PRESIDING COMMISSIONER FISHER:  Okay.

15   But drugs were intimately involved --

16           INMATE GREEN:  As far as --

17           PRESIDING COMMISSIONER FISHER:  -- in

18   your commitment offense.  So we need to know

19   about what your history was.  Is what's in here

20   correct?  Because I can simply read it into the

21   record.

22           INMATE GREEN:  Yeah, pretty much.

23           PRESIDING COMMISSIONER FISHER:  Okay.

24           INMATE GREEN:  Pretty much.  My mind was

25   probably more clear then on the drugs.  I don't

26   even -- My lifestyle now is totally all the way

27   positive compared to --

43

1       **PRESIDING COMMISSIONER FISHER:**   Okay.

2       **INMATE GREEN:**   -- that.

3       **PRESIDING COMMISSIONER FISHER:**   Okay.

4   According to what it says in here, it says that

5   you started drinking beer and smoking marijuana

6   when you were about 13 or 14.  Starting using

7   crack in '87 for about six months.  It says:

8   "He states that he used it daily and was also

9   selling it.  In September '88 he went to the

10  Tarzana Treatment Center.  He states that he

11  went there on his own for treatment of crack

12  cocaine and alcohol."

13      **INMATE GREEN:**   Yes.

14      **PRESIDING COMMISSIONER FISHER:**   Stayed

15  for six months.

16          "Does not feel that he was an

17          alcohol or drug -- has an alcohol

18          or drug problem presently.  He

19          states that he has not used since

20          he was in the treatment center.

21          He does acknowledge that he had a

22          substance abuse problem in the

23          past.  Mr. Green states that he

24          attends CA, NA and AA."

25  What's CA?

26      **INMATE GREEN:**   Cocaine Anonymous.

27      **PRESIDING COMMISSIONER FISHER:**   Okay.  On

44

1    the streets.   You attended that before you came

2    to prison?

3              INMATE GREEN:   Yes.

4              PRESIDING COMMISSIONER FISHER:   Okay.

5    "Mr. Green states that he was addicted to

6    cocaine.   He states that his drug use had a lot

7    to do with the breakups in his relationships,

8    that he did not know what he was doing and

9    didn't want to work."   Okay.   Is there anything

10   about your social history, your life before you

11   came to prison for this crime that you and I

12   haven't talked about that you think would be

13   important for us to know?

14             INMATE GREEN:   As far as what?

15             PRESIDING COMMISSIONER FISHER:   I just

16   want to make sure that I didn't miss anything

17   that you think is important.   And that you feel

18   like we covered everything thoroughly.

19             INMATE GREEN:   Other than I was -- They

20   got me for this crime a year later after the

21   crime had been committed.   It was a year later

22   when I was being more of a family man.   I was

23   staying with Melanie and her children and taking

24   care of my kids at the same time.   And I was --

25             PRESIDING COMMISSIONER FISHER:   So what

26   made you -- what made you change your ways for

27   that year before they caught you?

1    **INMATE GREEN:**  I guess, you know,

2    sometimes a person just get tired and want to

3    get, you know, get his life right.

4    **PRESIDING COMMISSIONER FISHER:**  So it

5    wasn't that killing this guy, you know, kind of

6    scared you into straightening your life out?

7    **INMATE GREEN:**  Well at that time I had a

8    lot of impact all my drug groups, right, and

9    after awhile it was like I felt that the drug

10    use wasn't doing no good.  It wasn't making it

11    better.  So you know that's when I just started

12    my life around.  What really -- When I went to

13    the Tarzana Treatment Center for that six

14    months, they pretty much helped me get my life

15    back on track.  And I haven't been abusing drugs

16    or nothing since.

17    **PRESIDING COMMISSIONER FISHER:**  Okay.

18    All right.  If we've covered everything, then if

19    you'll turn your attention to Commissioner

20    Mejia, he's going to go through your

21    programming.  Then we'll come back and go

22    through your parole plans.

23    **DEPUTY COMMISSIONER MEJIA:**  Okay.

24    Mr. Green, I'll be covering your institutional

25    adjustment in this portion of this hearing since

26    your last Board appearance.  Your last Board

27    appearance was on February 20, 2002.  You

46

1    received a three year denial.  The

2    recommendations were for you to remain or become

3    disciplinary-free, participate in self-help and

4    therapy.  Custody level is Medium A.

5    Classification score is 19.  You're currently

6    working as a gym porter.  Are you still working

7    as a porter, Mr. Green?

8         INMATE GREEN:  Yes.

9         DEPUTY COMMISSIONER MEJIA:  You have a

10   GED in 1998.  You have a 9.1 GPL.  Vocational

11   history, completed silkscreen printing and also

12   vocational eyewear optical trade.

13        INMATE GREEN:  Yes.

14        DEPUTY COMMISSIONER MEJIA:  Any other

15   vocation you completed?

16        INMATE GREEN:  How many did you just

17   name, two?

18        DEPUTY COMMISSIONER MEJIA:  Yeah.

19        INMATE GREEN:  What did you say,

20   silkscreen and what?

21        DEPUTY COMMISSIONER MEJIA:  Vocational

22   eyewear.

23        INMATE GREEN:  Vocational eyewear.

24   Silkscreen, vocational eyewear.  Carpentry,

25   electrical.

26        DEPUTY COMMISSIONER MEJIA:  I'm talking

27   about completion.  I've seen, sir, that you took

47

1    some of them, but I didn't see --

2         INMATE GREEN:  Yes.  Yes.  They was

3    completed.

4         DEPUTY COMMISSIONER MEJIA:  Do you have

5    any certificate to prove that?

6         INMATE GREEN:  It's not in my file?

7         DEPUTY COMMISSIONER MEJIA:  No.

8         INMATE GREEN:  How many certificates of

9    completion you have in my file?  Just two?

10        DEPUTY COMMISSIONER MEJIA:  Two.  Well,

11   if you find those, you can submit that later.

12        INMATE GREEN:  Yeah, they should be in

13   there.

14        DEPUTY COMMISSIONER MEJIA:  Self-help.  I

15   saw 1995, 1996, AA.  And I'm going to read

16   everything you gave me here.  You have

17   January 5, 2005 by the Muslim chapel, Anger

18   Management course, how to come a father and not

19   get angry.  You have participated in 10 video

20   reports on the Valley Adult School.  I don't

21   know which date is this.  What date are this?

22        INMATE GREEN:  Those are pretty recent.

23   I'm still in that course right (indiscernible).

24        DEPUTY COMMISSIONER MEJIA:

25   (Indiscernible).

26        INMATE GREEN:  It's a video course.

27        DEPUTY COMMISSIONER MEJIA:  Okay.  So you

48

1    got (indiscernible) video now?

2         **INMATE GREEN:** Yeah, they have

3    educational videos for us that work.  We still

4    participate in education through the videos.

5         **DEPUTY COMMISSIONER MEJIA:** You

6    participated in the Legal Services For Prisoners

7    With Children seminar, January 15, 2005.

8    June 15, 2005.  And you have a laudatory chrono

9    from the CC-III Salvage (phonetic) for attending

10   the Legal Services For Prisoners With Children

11   seminar.  Another Anger Management course,

12   December 2004, by the Eman Jana (phonetic).

13   These are after -- before your initial parole

14   consideration.  You attended Crim-Anon,

15   communication tools course by Crim-Anon on

16   October 1, 2001, July 2001, September 2002.

17   Anything else that you think I missed,

18   Mr. Green?  I've read everything that you gave

19   me here.

20        **INMATE GREEN:** Okay.  That's just as far

21   as the institution.  Those are just far as the

22   institution chronos, right?

23        **DEPUTY COMMISSIONER MEJIA:** Yeah, that's

24   what I'm looking for.

25        **INMATE GREEN:** Okay.

26        **DEPUTY COMMISSIONER MEJIA:** Your

27   institutional programming between 2002 and

49

1  today.

2      INMATE GREEN:  Okay.  Yeah.  That's

3  pretty much it.

4      DEPUTY COMMISSIONER MEJIA:  I've got a

5  question for you.  I heard your background about

6  substance abuse.

7      INMATE GREEN:  Yes.

8      DEPUTY COMMISSIONER MEJIA:  Why is it

9  that you only have a year of AA dealing with

10  your substance abuse?

11      INMATE GREEN:  Well, a lot of places that

12  I went to I never really got to get too much

13  into my NA and AA program.  I think it was

14  Calipat (phonetic) I was able to get in.

15      DEPUTY COMMISSIONER MEJIA:  Yeah, for a

16  year.

17      INMATE GREEN:  Yeah, I was able to work

18  and participate in that.  Because I don't have

19  no -- I don't have no drug problem.  I don't

20  drink.  I don't use drugs, you know.

21      DEPUTY COMMISSIONER MEJIA:  I already

22  heard that.  But my question is you've been down

23  15 years and you were Medium-A since 1996.

24  That's almost nine years of good custody, which

25  means that you're not very much restricted as a

26  Medium-A custody.  And the -- And I've heard

27  that you have issues with drugs.  What would --

1    **INMATE GREEN:**  Not no more.

2    **DEPUTY COMMISSIONER MEJIA:**  --

3    (indiscernible) you know --

4    **INMATE GREEN:**  I had them.

5    **DEPUTY COMMISSIONER MEJIA:**  Based on your

6    institutional programming, what would tell me

7    that you're not the same person that's having

8    drug problem before and now?

9    **INMATE GREEN:**  Well, all you have to do

10    is look at a lot of the drug tests that they've

11    been taking from me.  The last six or seven

12    years since I was -- from Ironwood all the way

13    until I came to Soledad they've been testing me

14    every month.

15    **DEPUTY COMMISSIONER MEJIA:**  Okay.

16    **INMATE GREEN:**  Behind the riot that had

17    had happened down at Ironwood where they was

18    trying to say -- had something to do with drugs,

19    and it didn't have nothing to do with drugs.  It

20    was a riot that broke out with blacks and

21    Mexicans.  For some reason, they started testing

22    me every month.  Right.  And I never gave a

23    dirty test nowhere in my file.  Nowhere in my

24    file --

25    **DEPUTY COMMISSIONER MEJIA:**  Okay.

26    **INMATE GREEN:**  -- does it say anything

27    about alcohol or any kind of drugs.

51

1       **DEPUTY COMMISSIONER MEJIA:**  When you were

2  seen by the Board in '98 -- When you're telling

3  the Commissioner that you've been in the Board,

4  you sounded like you've been in the Board so

5  many times.  You've been in the Board one time

6  for your parole consideration.  You were seen by

7  a Commissioner one time, one-on-one, to tell you

8  what they expect you to have by the time you go

9  to the initial parole consideration hearing.

10       **INMATE GREEN:**  You mean in '98?

11       **DEPUTY COMMISSIONER MEJIA:**  That's what

12  it is.  It's a documentation hearing.  That's

13  what the Commissioner said.  That's not a parole

14  consideration hearing.  Did they tell you to

15  make sure that you participate in self-help?

16       **INMATE GREEN:**  Yes.

17       **DEPUTY COMMISSIONER MEJIA:**  Okay.  And is

18  this all the self-help that you -- for the last

19  15 years?  This is the most recent right here.

20       **INMATE GREEN:**  Yes, that's all the

21  self-help that I participated in right there.

22       **DEPUTY COMMISSIONER MEJIA:**  What kind of

23  insight did you get from the time that you

24  committed the crime and what it is now as a

25  person to assure me that you're not going to be

26  the same person that did the crime today if I

27  release you?

52

1     **INMATE GREEN:**  Well, for one that person

2    that I was during them years was a little boy,

3    you know.  You know, that was over, what, 18

4    years, 19 years ago.  I have gotten more into

5    studying the word now.  I'm more into helping

6    others than, you know, than I was back then.  I

7    went to -- As you can see right there, the

8    letter that I got from the Eman, I participate

9    in the Islamic Community.  For the last -- say

10   about the last two years I've been heavily

11   involved in the Islamic community.

12     **PRESIDING COMMISSIONER FISHER:**  Just one

13   second, let me flip the tape.

14     [Thereupon, the tape was turned over.]

15     **DEPUTY COMMISSIONER MEJIA:**  Continue,

16   sir.

17     **INMATE GREEN:**  Yes.  I've been involved

18   with the Islamic community for the last 10

19   years.  But now I help -- helping other inmates

20   change their life.  Helping other gang members

21   get theirselves on the right track and become

22   more responsible men.  So I'm trying to do

23   things to, you know, to where I can give

24   something back to society.  You know, recently

25   we wrote a letter to Ms. Bush dealing with the

26   Gang Prevention program in LA.  And you know,

27   there's a lot of things, you know, that I'm

53

1   into.

2          DEPUTY COMMISSIONER MEJIA:  So you teach

3   the word.  When you say you teach the word, are

4   you talking about the Christian bible?

5          INMATE GREEN:  The Christian bible and

6   the holy Quran.  I'm a Muslim.  I'm a Muslim.

7          DEPUTY COMMISSIONER MEJIA:  Okay.

8          INMATE GREEN:  You know, I've been a

9   Muslim for the last 10 years studying Islam.

10          DEPUTY COMMISSIONER MEJIA:  And the word

11   is the Quran?  Not the Christian bible?

12          INMATE GREEN:  Both of them.

13          DEPUTY COMMISSIONER MEJIA:  Both of them?

14          INMATE GREEN:  All the revelations from

15   God, that's what we study.  The original holy

16   bible and the holy Quran.  We study and strive

17   to live by those laws.

18          DEPUTY COMMISSIONER MEJIA:

19   (Indiscernible) that you were teaching them?

20          INMATE GREEN:  Well, if you read my --

21          DEPUTY COMMISSIONER MEJIA:  No, you have

22   in there?  Is it part of this one?

23          INMATE GREEN:  Yeah.  Did I give -- I

24   gave a letter from Eman.  It might be over

25   there.

26          PRESIDING COMMISSIONER FISHER:  All

27   right.  (Indiscernible) letters.

54

1       **INMATE GREEN:**  A letter from the Eman, he

2  wrote me a letter for recommendation over there.

3       **PRESIDING COMMISSIONER FISHER:**  What is

4  -- Is it typed?

5       **INMATE GREEN:**  It's a typed letter, yeah.

6       **PRESIDING COMMISSIONER FISHER:**  Okay.

7  Here it is.  I think this is it.

8       **INMATE GREEN:**  Now that was my second one

9  from this Eman.  Then I have one from Pleasant

10  Valley Eman when I was down there for three

11  years.

12       **DEPUTY COMMISSIONER MEJIA:**  They didn't

13  say about the Christian bible if you've been

14  teaching.

15       **INMATE GREEN:**  You know, the holy Quran

16  and the bible is -- those are our scriptures.  I

17  mean, that's --

18       **DEPUTY COMMISSIONER MEJIA:**  No.  I'm

19  talking --

20       **INMATE GREEN:**  -- Islam.

21       **DEPUTY COMMISSIONER MEJIA:**  The Eman's

22  talking about your -- I don't see any

23  documentation that you've been teaching bible

24  studies somewhere.  Do you have it recorded in

25  the protestant chapel?

26       **INMATE GREEN:**  What is he saying there?

27       **DEPUTY COMMISSIONER MEJIA:**  You tell me

55

1   what he's saying there.  I heard it.  Put in the

2   record that you're teaching orientation, ethics,

3   fatherhood.  What else?  I'm talking about you

4   saying that you're teaching the word, which is

5   the Christian bible, and the Quran.  Okay.  Now

6   I'm now convinced that you are basically with

7   the Islamic religion.

8         INMATE GREEN:  Yeah.

9         DEPUTY COMMISSIONER MEJIA:  Now where's

10  the documentation that you've been teaching

11  bible studies?

12        INMATE GREEN:  Well I don't have

13  documentation.  I'm just letting you know what

14  I've been doing.

15        DEPUTY COMMISSIONER MEJIA:  I would

16  advise you to get it documented so it will be in

17  the file so it will be recognized.

18        INMATE GREEN:  Okay.  That will be a good

19  thing.

20        DEPUTY COMMISSIONER MEJIA:  You need to

21  get it documented.  All right.

22        INMATE GREEN:  Okay.

23        DEPUTY COMMISSIONER MEJIA:  Let's go to

24  your --

25        INMATE GREEN:  The Board never asked me

26  to get that documented before.

27        DEPUTY COMMISSIONER MEJIA:  Everything

56

1    that you do, okay, just for your benefit, that

2    you do for yourself, the books that you read

3    that you think will be helpful to yourself

4    should be documented.  You can write a book

5    report.  Anything that you do good, you have

6    someone document it and put it in your file.

7         **INMATE GREEN:**  Yes, Sir.

8         **DEPUTY COMMISSIONER MEJIA:**  Any

9    attendance you do, you know, even if your

10   counseling with the youngsters here, get

11   somebody to document it so it's all going to be

12   here.  Because we're all relying on this here,

13   what's on paper.  Okay.  So we're going to go to

14   your disciplinary history.  You have eight 115's

15   from July 1992, your last being in May 2002.

16   Let me ask you.  You went to the Board hearing

17   on 2-20-02.  February 20, 2002.  Three days

18   after that you received a 115 for participation.

19        **INMATE GREEN:**  Yes, I did.

20        **DEPUTY COMMISSIONER MEJIA:**  Would you

21   please explain that to me.

22        **INMATE GREEN:**  I had never --

23        **DEPUTY COMMISSIONER MEJIA:**  The Board

24   told you not to --

25        **INMATE GREEN:**  I had a nervous breakdown.

26   It says it on the 115.  If you read the 115,

27   it'll tell you that I had a nervous breakdown

57

1  from my Board hearing, right after my Board

2  hearing.  Because this is what I'm saying, like

3  the games that they are playing in these Board

4  hearings, they're telling me one thing that I

5  would be released at a certain day.  I'm going

6  to Board hearing after Board hearing and I'm not

7  being released for some kind of disciplinary

8  action that's going on in prison when I have

9  already been convicted from court.

10        DEPUTY COMMISSIONER MEJIA:  Okay.

11        INMATE GREEN:  This is stuff that makes a

12  person have nervous breakdowns in prison.

13        PRESIDING COMMISSIONER FISHER:

14  Mr. Green, let me -- let me interject here

15  quickly --

16        INMATE GREEN:  I couldn't stop.

17        PRESIDING COMMISSIONER FISHER:  --

18  because I'm concerned about the fact that you're

19  representing yourself and you don't understand

20  how the Penal Code works regarding your minimal

21  eligible parole date.  As I explained to you

22  earlier, we don't take into consideration your

23  minimum eligible parole date until we find you

24  suitable under the factors of suitability that

25  are listed in Title XV.  Are you familiar with

26  Title XV?

27        INMATE GREEN:  Yes, I understand that.

58

1        PRESIDING COMMISSIONER FISHER:  Okay.

2        INMATE GREEN:  You explained that to me.

3        PRESIDING COMMISSIONER FISHER:  Okay.

4        INMATE GREEN:  But like I said --

5        PRESIDING COMMISSIONER FISHER:  All

6   right.  But you're still --

7        INMATE GREEN:  -- he's asking me what

8   happened then.

9        PRESIDING COMMISSIONER FISHER:  Okay.

10        INMATE GREEN:  And that's what happened.

11   I had a nervous breakdown not understanding this

12   Penal Code system during that time.

13        PRESIDING COMMISSIONER FISHER:  All

14   right.

15        INMATE GREEN:  And I couldn't control it,

16   you know.

17        PRESIDING COMMISSIONER FISHER:  All

18   right.

19        INMATE GREEN:  It was like --

20        PRESIDING COMMISSIONER FISHER:  Stop for

21   a minute.  Stop.  Because the way you were

22   characterizing it just now was you started going

23   in again --

24        INMATE GREEN:  Yeah.

25        PRESIDING COMMISSIONER FISHER:  --

26   talking about the fact that you think that it's

27   game playing.

59

1          **INMATE GREEN:**  You know, I know, but

2     let's just --

3          **PRESIDING COMMISSIONER FISHER:**  I want

4     you to be clear.  I want to understand that you

5     understand what --

6          **INMATE GREEN:**  Yeah, I understand now.

7     You told me -- You explained it to me now.

8          **PRESIDING COMMISSIONER FISHER:**  All

9     right.

10          **INMATE GREEN:**  Right.  Well then --

11          **PRESIDING COMMISSIONER FISHER:**  All

12     right.  Thank you.

13          **INMATE GREEN:**  Then it was a whole

14     different --

15          **DEPUTY COMMISSIONER MEJIA:**  Okay.  The

16     second one.  The second one.

17          **PRESIDING COMMISSIONER FISHER:**

18     (Indiscernible).

19          **DEPUTY COMMISSIONER MEJIA:**  You had

20     another one on May 26, 2002 for disobeying

21     direct order.  What's the deal about that?

22          **INMATE GREEN:**  Me and the CO had got into

23     -- right after that one.  Because there was two

24     right back to back.  Two 115's.

25          **DEPUTY COMMISSIONER MEJIA:**  Two months

26     after.

27          **INMATE GREEN:**  That one was over the

60

1    telephone.  Me and the CO had got into an

2    argument behind him hanging the telephone up on

3    my people on the phone.

4         **DEPUTY COMMISSIONER MEJIA:**  Okay.  And

5    what did you do?

6         **INMATE GREEN:**  I just remember we got

7    into an argument and (indiscernible) lock it up

8    and wrote me up.

9         **DEPUTY COMMISSIONER MEJIA:**  Okay.

10        **INMATE GREEN:**  He was in the tower.  I

11   was on the phone.  Down there they run the

12   phones from the tower.  And we had -- exchange

13   of some words.

14        **DEPUTY COMMISSIONER MEJIA:**  Did you

15   understand what the Board told you the last

16   time?

17        **INMATE GREEN:**  Yes, I understood what

18   they were saying.

19        **DEPUTY COMMISSIONER MEJIA:**  Stay, remain

20   disciplinary-free.

21        **INMATE GREEN:**  Yes.  And like I explained

22   in that 115 about the nervous breakdown that I

23   had.

24        **DEPUTY COMMISSIONER MEJIA:**  How about

25   this one?

26        **INMATE GREEN:**  I even refused to work.  I

27   didn't even want to go to work no more or

61

1   nothing.

2        DEPUTY COMMISSIONER MEJIA:  How about

3   this one?  Being defiant to an officer?

4        INMATE GREEN:  Yes.  It was during the

5   same time when I was --

6        DEPUTY COMMISSIONER MEJIA:  Okay.

7        INMATE GREEN:  -- I was going through it

8   then.  I was --

9        DEPUTY COMMISSIONER MEJIA:  Okay.

10       INMATE GREEN:  But I haven't had a

11  write-up since then.

12       DEPUTY COMMISSIONER MEJIA:  Yeah, that's

13  why I --

14       INMATE GREEN:  Since I've been here at

15  Soledad, I haven't even had a 128, 115 since

16  I've been here.  I've been working and I've been

17  staying disciplinary-free.

18       DEPUTY COMMISSIONER MEJIA:  Your 128's

19  you have 11 of them from 1992 to 2000.  And the

20  last being in 2000.  Validated gang affiliation

21  on the 812 indicates that you are a Grape Street

22  Crip member.  Are you still (indiscernible) with

23  that?

24       INMATE GREEN:  No, that should be off my

25  record also.  I'm no longer affiliated with

26  gangs.

27       DEPUTY COMMISSIONER MEJIA:  No longer?

1   **INMATE GREEN:**   No.

2   **DEPUTY COMMISSIONER MEJIA:**   Okay.   That's

3   still there so I'm going to have to put that on

4   record that you're still there.   So what you can

5   do, let me give you advice again, if you think

6   that it's not accurate, have your -- talk to

7   your counselor.   Okay.   And see what he can do

8   to remove it or maybe he can put it as an

9   inactive Grape Street gang member.   Okay.   If he

10   doesn't do anything with it, 602 it.

11   **INMATE GREEN:**   See, I don't even know how

12   that even got in my file from the beginning

13   because my case -- not even gang related.   It

14   had nothing to do with Grape Street.   And all of

15   a sudden now they labeled me as a Grape Street

16   Crip.

17   **DEPUTY COMMISSIONER MEJIA:**   Okay.   But I

18   just told you what you should do with that.

19   Okay.   Let's go to your psych report.

20   October 1, 2005 by Dr. Macomber, M-A-C-O-M-B as

21   in boy E-R, clinical psychologist.   The

22   diagnostic impression or clinical assessment

23   indicates that there was no evidence of

24   depression or anxiety.

25          "Intellectually he's functioning

26          in the average range.   There's no

27          evidence of a thought disorder or

63

| | |
|---|---|
| 1 | cognitive impairment.  His |
| 2 | adjustment continues to be good. |
| 3 | Memory continues to be intact. |
| 4 | His insight or self-awareness is |
| 5 | good.  Current diagnostic |
| 6 | impression.  Axis I, No |
| 7 | Contributory Clinical Disorder. |
| 8 | Axis II, No Contributory |
| 9 | Personality Disorder.  Axis III, |
| 10 | No Contributory Physical Disorder. |
| 11 | Axis IV, Life Term Incarceration. |
| 12 | Axis V, GAF of 90." |
| 13 | Assessment of dangerousness.  In considering his |
| 14 | potential for dangerous behavior in an |
| 15 | institutional environment, he agreed with the |
| 16 | previous evaluator who indicated that his |
| 17 | potential for dangerous behavior is lower than |
| 18 | average.  He has not participated in any |
| 19 | assaults, possession of weapons, riots in the |
| 20 | prison. |
| 21 | "In considering his potential for |
| 22 | dangerous behavior if released to |
| 23 | the community, at this point he |
| 24 | does not present any more threat |
| 25 | to society than the average |
| 26 | citizen in the society.  In the |
| 27 | past, drug involvement was a risk |

64

1           factor.  The commitment offense

2           was related to drug use.  However,

3           inmate Green has made serious and

4           significant changes in this area.

5           There is no longer a risk factor."

6   Which I totally disagree with.  It says here

7   that:

8           "There's no mental or emotional

9           problems in this case that would

10          interfere with granting a parole

11          date.  Inmate Green does have

12          significant family support in the

13          community.  He has valid job

14          offers as well as residence

15          available.  He continues to

16          participate in self-help programs.

17          He showed me certificates he has

18          obtained since his last Board

19          appearance and participation in

20          Anger Management, parental skills.

21          And he also has participated in

22          three Crim-Anon courses, including

23          communication skills, way to

24          happiness and handling

25          suppression.  He has participated

26          in all of the Muslim chapel

27          programs also.  The prognosis for

65

1        a successful adjustment in the

2        community is very good."

3  Do you have anything to add with that

4  presentation, Mr. Green?

5        **INMATE GREEN:**  No, Sir.

6        **DEPUTY COMMISSIONER MEJIA:**  Let me return

7  this back to the Chair.

8        **PRESIDING COMMISSIONER FISHER:**  All

9  right.  Thank you.  And I just want to quickly

10  talk about your parole plans a little bit.  I

11  have four letters of support for you.  And in

12  addition to those two, I have -- wait a minute,

13  I've got some in here I think.  Let me double

14  check here.  I may have missed some.  I have

15  this one.

16        **DEPUTY COMMISSIONER MEJIA:**  Okay.  How

17  about (indiscernible)?

18        **PRESIDING COMMISSIONER FISHER:**  Yeah.  I

19  have that one.  Yeah, I have --

20        **DEPUTY COMMISSIONER MEJIA:**  Okay.

21        **PRESIDING COMMISSIONER FISHER:**  And I

22  think I have that one.  Let me see.  Yep.  Got

23  it.  It looks like they're also in here.  All

24  right.  So I have letters of support from your

25  mom and other family members.  I also have a job

26  offer from Midas offering you a job as a

27  dispatcher.  And I have a letter from Weingart

1    (phonetic) Center Association regarding the

2    Steers (phonetic) program.  It says it's a six

3    -- I think it's a six-month program.  Some of

4    the writing is sort of smeared here.

5           **INMATE GREEN:**  Yes, six-months.

6           **PRESIDING COMMISSIONER FISHER:**  Okay.

7    Funded by CDC, assisting parolees to transition.

8    And it says:

9           "We provide food and a single room

10          for all of our clients.  Case

11          management services, which include

12          24-hour, seven days a week

13          monitoring, random drug testing,

14          counseling sessions and referrals

15          to social services for medical and

16          personal needs.  We also have a

17          direct line with EDD and Work

18          Source that works with all of our

19          parolees to help them find jobs."

20   Let's see here.  They have a parole agent there

21   who has 24-hour access to people housed there.

22   It says:

23          "We also work in the human

24          services field.  We who work in

25          the human services field believe

26          that everyone deserves a second

27          chance, especially if they have

1         demonstrated (indiscernible).

2         According to Ms. Mangrum

3         (phonetic), her son has acquired

4         an A.A. degree in addition to

5         tirelessly working to help his

6         fellow inmates with some of their

7         issues."

8    Now this hasn't -- This doesn't specifically say

9    that they have a bed available for you.  Is that

10   what they told you, that they do?

11        INMATE GREEN:  Well, yes.

12        PRESIDING COMMISSIONER FISHER:  Okay.

13        INMATE GREEN:  They have a bed available

14   for me.  But I really want to go live with my

15   mother.

16        PRESIDING COMMISSIONER FISHER:  Okay.

17   And your mom didn't specifically say that you

18   would live with her, but her letter -- her

19   letters were very supportive.  So I don't need

20   for her to do that.  Now what about work.  What

21   would you do for work if you were released?

22        INMATE GREEN:  Do you have this letter

23   from her?  What letter do you have from my

24   mother?  This one right here is --

25        PRESIDING COMMISSIONER FISHER:  I have

26   three.  I have three letters.

27        INMATE GREEN:  This one right here is

68

1  saying right here, yes, you have a home to come

2  to.

3          PRESIDING COMMISSIONER FISHER:  Good.

4  Okay.

5          INMATE GREEN:  I am now in Paramount

6  (indiscernible) where she stays at now.

7          PRESIDING COMMISSIONER FISHER:  Okay.

8  Good.  Good.  So we have four letters from your

9  mom, all of which are supportive.  So what would

10  you do?  Would you do the Midas job?  Is that

11  what you would want to do for work?

12         INMATE GREEN:  Yeah, well, yeah.  That's

13  our business now.  That's one --

14         PRESIDING COMMISSIONER FISHER:  Okay.

15  The family --

16         INMATE GREEN:  -- of our business that we

17  have.

18         PRESIDING COMMISSIONER FISHER:  -- the

19  family owns it.

20         INMATE GREEN:  Family business, yeah.

21         PRESIDING COMMISSIONER FISHER:  Okay.

22  All right.  So that would be your job.  All

23  right.  What about substance abuse programming?

24  Are you going to do that on the outside?

25         INMATE GREEN:  Well, yes, see this is

26  another letter from Tarzana Treatment Center.  I

27  don't think you had this one.

1           **PRESIDING COMMISSIONER FISHER:**  I didn't.

2           **INMATE GREEN:**  I have a lot of friends

3  that's still there, right.

4           **PRESIDING COMMISSIONER FISHER:**  Okay.

5           **INMATE GREEN:**  At Tarzana, and they you

6  know, they've been very supportive for me.

7  That's the Tarzana that I was housed in on the

8  street when I was out there.

9           **PRESIDING COMMISSIONER FISHER:**  Okay.

10          **INMATE GREEN:**  Saying they want to help

11  me get my life back together.  They're the ones

12  still write me and support me pretty -- you know

13  -- pretty much.

14          **PRESIDING COMMISSIONER FISHER:**  Okay.

15  And this says:

16          "This letter will serve to verify

17          that I've known Mr. Green for a

18          number of years.  From all

19          appearances, he gives the

20          impression of being willing and

21          ready to return to the community.

22          To assist his transition back into

23          the mainstream of society, the

24          following services are available.

25          Transition assistance in the form

26          of housing, personal counseling,

27          vocational counseling and job

1        placement assistance.  Mr. Green

2        acknowledged that he would fully

3        participate in his resumption of

4        social responsibility."

5  And this is signed by Mike D'Agostin, and that's

6  D apostrophe A-G-O-S-T-I-N.  He's the senior

7  supervisor of the Criminal Justice Services at

8  Tarzana Treatment Center.  Okay.  Is there

9  anything else about your parole plans that I

10  haven't talked about that you think we should

11  know?

12        **INMATE GREEN:**  No, that's about it.

13        **PRESIDING COMMISSIONER FISHER:**  All

14  right.  Before we move on to questions --

15        **DEPUTY COMMISSIONER MEJIA:**  I want my

16  turn too when you're done.

17        **PRESIDING COMMISSIONER FISHER:**  Yeah.

18  Before we move on to questions, I just want to

19  -- I went back in response to what you had said

20  about the record not being complete.  I went

21  through the probation officer's report summary

22  and also through the Appellate summary.  And I

23  found some inconsistencies or some things that

24  have been left out.  Not inconsistencies.  But

25  I'm going to read those into the record just to

26  add to the summary that I read.  And then if

27  there's anything that I missed, would you just

1      --

2          **DEPUTY DISTRICT ATTORNEY HIGGINS:**    When

3    it comes to suitability, I'll incorporate --

4          **PRESIDING COMMISSIONER FISHER:**    Okay.

5    Thank you.

6          **DEPUTY DISTRICT ATTORNEY HIGGINS:**    -- my

7    observations and that.

8          **PRESIDING COMMISSIONER FISHER:**    Thank

9    you.    The probation officer's report and the

10   version that I read was exactly the same.

11   Everything verbatim.    The issues that I found

12   that were not in the probation officer's report

13   was the fact that there was a third person,

14   another person there when everyone kind of

15   arrived at the residence whose name was Harvey.

16   Last name was Harvey.    Tom Harvey.    And it said

17   that Mr. Reed was sitting with the AK-47 on a

18   sling across his shoulder and had the bayonet on

19   his belt at that time.    It said that Johnson had

20   seen him with the AK-47 days before.    They

21   smoked some (indiscernible) containing marijuana

22   and cocaine.    Reed and Mr. Green ate some

23   potatoes.    And then it goes on into the argument

24   and the information that was in the probation

25   officer's report.    It also says that -- talks

26   about after Mr. Green pointed the weapon at

27   Johnson and told him to sit down it says:

72

1     "After more yelling and screaming,

2     the appellant fired again.  This

3     time he wounded his brother,

4     Joseph Mangrum, in the foot.

5     Mangrum, who had been sleeping in

6     the bedroom, came out and told

7     appellant he had shot him.

8     Appellant became angrier and said,

9     look what you made me do.  You

10     made me shoot my own brother.

11     Appellant told Mangrum to go to

12     the hospital and told Johnson that

13     he couldn't leave until Mangrum

14     returned.  At gunpoint, the

15     appellant then told Johnson to

16     take off his clothing to ensure

17     that he was not armed. When

18     appellant determined that Johnson

19     was not armed, he told him to put

20     his pants back on.  Reed asked

21     appellant to let him go to the

22     hospital but appellant refused to

23     let him go.  Appellant, Reed and

24     Johnson waited for eight and a

25     half hours for Mangrum to return.

26     Appellant let Johnson leave and

27     warned him not to disclose what

73

1    had happened."  It also says that:

2        "Appellant asked Johnson to check

3        on Reed whose arm moved when

4        Johnson touched it.  Johnson did

5        not tell anyone what had happened

6        and stayed away from the

7        neighborhood for nearly a year

8        because he was afraid.  Delano

9        Reed bled to death as the result

10       of multiple gunshot and stab

11       wounds to his thighs.  The coroner

12       believed that the victim died at

13       least before 7:15 p.m. on

14       February 24, but noted that he

15       probably died the morning of

16       February 24 or even possibly the

17       evening of February 23."

18   And it goes on to explain why the coroner felt

19   that way.  And I think that's everything that I

20   saw that was related directly to the offense and

21   not the investigation that was different.  So if

22   there's anything I missed, you can put

23   (indiscernible).  All right.

24       **DEPUTY DISTRICT ATTORNEY HIGGINS:**

25   (Indiscernible) again when I (indiscernible).

26       **PRESIDING COMMISSIONER FISHER:**  All

27   right.  Thanks.  Okay.  Having done that, do you

74

1   have any questions, Commissioner?

2          DEPUTY COMMISSIONER MEJIA:  Yeah.

3   Mr. Green.

4          INMATE GREEN:  Yes, Sir.

5          DEPUTY COMMISSIONER MEJIA:  Just want to

6   give you another opportunity to explain to me

7   what happened on the disobeying -- direct order

8   from the officer.

9          INMATE GREEN:  I was on -- I was on the

10  phone and he told me to get off the phone.  He

11  said he had told me to get off the phone.  I

12  didn't hear him say get off the phone the first

13  time and he hung the phone up.  And I was

14  telling him about, you know, why did he hang up

15  the phone in my face.  And he said, I told you

16  to get off the phone.  And he got all

17  belligerent and I got belligerent and

18  (indiscernible) it was all over the phone call.

19         DEPUTY COMMISSIONER MEJIA:  Okay.  Thank

20  you.  That's it.

21         PRESIDING COMMISSIONER FISHER:  Do you

22  have questions that are not related to the

23  commitment offense?

24         DEPUTY DISTRICT ATTORNEY HIGGINS:  Not

25  related to the offense, no.

26         PRESIDING COMMISSIONER FISHER:  Okay.  I

27  don't have anything either.  Why don't you go

75

1    ahead and close.

2    **DEPUTY DISTRICT ATTORNEY HIGGINS:**  LA

3    County DA's office would oppose setting a date

4    for this prisoner.  Although the psych reports

5    indicate lip service to acknowledgement of

6    guilt, the detail contained in the '05 report

7    and the '01 report, which incorporates by

8    reference, indicate somebody who has not

9    accepted responsibility contrary to the benign

10   assessment of the psychologist.  And I'm taking

11   direct quotes "it's a robbery that went bad,

12   attempted at the robbery, considerable gunfire

13   on both sides, a witness may have been shot" and

14   they ran out after the shooting and that they

15   were wearing stocking masks.  The facts of the

16   offense are there was a dispute over stolen

17   drugs but it was not an invasion robbery, there

18   were no stocking masks, nobody ran out the door

19   because the victim was held there until he bled

20   to death as this man stood guard over him.  And

21   contrary to the fact he states, I may have shot

22   somebody else, it was his own brother.  And the

23   statement of responsibility is totally hollow

24   when you look at the substance of what he says.

25   And I'd be remiss if I didn't comment on the

26   psychologist, the reports, they are not worth

27   the paper they're written on because they have

76

1    not done the work.  And what is unfair to the

2    inmate is they tell him this and he continues to

3    deny responsibility, although lip service to it,

4    because he has changed the facts.  And the

5    psychologists absolutely do a disservice because

6    he reads that report and says everything's

7    great, everything's wonderful.  And it's not

8    because until he accepts responsibility I can't

9    conceive of he or any other prisoner being

10   released when they do that kind of sidestepping

11   and ducking when it comes to responsibility and

12   they're aided and abetted by psychologists who

13   are not helping them, they're actually hurting

14   them.

15        **PRESIDING COMMISSIONER FISHER:**  Thank

16   you.  (Indiscernible) would you like to go ahead

17   and make your final statement?

18        **INMATE GREEN:**  Yes.  I have took

19   responsibility for the murder of Delano Reed.  I

20   took that responsibility, that I know that I --

21   that my gun could have killed this victim, even

22   though -- even though it was never proven that

23   my bullets was in the victim or not.  It was

24   never proven who shot my little brother.  You

25   know, these are facts that was never proven in

26   this case.  And I've took responsibility that I

27   was -- I was there at that shootout, you know.

77

1    I showed remorse for his family and the victim,

2    you know.  I'm really sorry that somebody, you

3    know, lost their life in a situation like that.

4    That's all about I can say, you know.  I accept

5    responsibility for it though.

6         **PRESIDING COMMISSIONER FISHER:**  Okay.

7    All right.  At this point in the hearing,

8    Mr. Green, we're going to recess to deliberate.

9    So I just want to make sure before we do that,

10    since you're here representing yourself, have

11    you -- have you said everything in your closing

12    statement that you need to say before we

13    deliberate?

14         **INMATE GREEN:**  Yes.

15         **PRESIDING COMMISSIONER FISHER:**  Okay.

16    Then we're going to go ahead and recess.  We'll

17    have you come back in as soon as we have a

18    decision.

19         **INMATE GREEN:**  Okay.

20                   **R E C E S S**

21                    --oOo--

22

23

24

25

26

27

78

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    ~~DECISION~~

3    DEPUTY COMMISSIONER MEJIA:  We're back on

4    record.

5    PRESIDING COMMISSIONER FISHER:  All

6    right.  Thank you.

7    DEPUTY COMMISSIONER MEJIA:  For our

8    decision on Mr. Green's matter.

9    PRESIDING COMMISSIONER FISHER:  Thank

10   you.  I want to note for the record that

11   everyone who was previously in the room and

12   identified themselves have returned to the room.

13   Mr. Green, the Panel's reviewed all information

14   received from the public and relied on the

15   following circumstances in concluding that

16   you're not yet suitable for parole and would

17   pose an unreasonable risk of danger to society

18   and a threat to public safety if released from

19   prison.  I'm going to try to be real specific

20   with you about what you need to do because you

21   said that you were not clear on it.  And I want

22   to make sure that you understand what we're

23   looking for as a Board in general, not just

24   these two Commissioners but (indiscernible)

25   Commissioners.  The first thing that we

26   considered when we reached our decision

27   RAYMOND GREEN    E-68189    DECISION PAGE 1    10/27/05

79

1    regarding suitability was the commitment

2    offense.  And certainly this was a really cold

3    blooded crime.  Based on the information that we

4    have in the Statement of Facts this was a

5    situation where Mr. Reed was a drug dealer.

6    That he and his friends were -- had gotten

7    together at this location essentially to do

8    drugs.  That there was an argument where

9    Mr. Green accused the victim of stealing

10   something from him or taking something from him

11   and ultimately Mr. Green shot him at close range

12   in the leg with an AK-47.  He also during the

13   course of firing the weapon shot his brother in

14   the foot.  His brother was allowed to leave to

15   go get help.  The victim here, Mr. Reed, was

16   not.  Unfortunately, the artery in Mr. Reed's

17   leg was severed from the gunshot wounds and he

18   bled to death because he was kept at the

19   location and not allowed to leave, that

20   guaranteed his death as opposed to a possible

21   chance that had he gotten assistance he may have

22   been able to be saved.  This was -- This was a

23   cold-blooded crime and it was over a really

24   minimal motive.  The motive was just as trivial

25   as can be.  It was over an argument during an

26   evening of doing drugs.  Mr. Reed does have a

27   **RAYMOND GREEN    E-68189    DECISION PAGE 2    10/27/05**

80

1    prior criminal history. None of his priors

2    involve violence. They did involve weapons and

3    narcotics though which interestingly enough are

4    also part of this commitment offense. Well,

5    I'll get to this part. I want to go through the

6    process here and then I'll come back to this.

7    While he's been incarcerated, Mr. Green has had

8    eight 115 disciplinary reports. The last two

9    were since his last Board hearing. And he's had

10   11 128(a) counseling chronos, the last one of

11   those was back in 2000. He has not yet

12   completed an adequate amount of self-help in a

13   couple of areas in particular. Although he has

14   upgraded educationally and vocationally, at this

15   time the positive aspects of behavior do not yet

16   outweigh the factors of unsuitability. In a

17   separate decision the hearing Panel finds that

18   the prisoner was convicted of murder and it's

19   not reasonable to expect that parole would be

20   granted a hearing during the next four years.

21   The specific reasons for this finding are as

22   follows. First of all the commitment offense,

23   which was exceptionally brutal. This was a

24   friend. He was not only shot and injured, but

25   he was kept at the location and not allowed to

26   get help while he bled profusely from an artery

27   **RAYMOND GREEN    E-68189    DECISION PAGE 3    10/27/05**

81

1   in his leg until he died from that wound.  It

2   was over an extended period of time, possibly as

3   much as eight and a half hours.  Any time during

4   that time Mr. Green could have released him to

5   get assistance and possibly have helped him save

6   his own life.  Once again, Mr. Green does have a

7   history of criminal conduct.  None of his prior

8   arrests or convictions involve violence, but

9   they do involve drugs and weapons, issues that

10  were involved in this commitment offense.  We

11  have two psych evaluations in a row that I think

12  that the District Attorney addressed pretty

13  eloquently.  And it's nice to hear someone else

14  saying on record some of the things that I've

15  been saying on record about these psych reports.

16  Both of them, the current one by Dr. Macomber

17  and the previous one by Dr. Dietsch, are based

18  entirely on the inmate's input.  It doesn't look

19  like anybody read the probation officer's

20  report.  It doesn't look like anybody read the

21  Appellate decision.  They seem to just be along

22  for the ride regarding his discussion of how the

23  shooting may have happened.  And as he indicated

24  to us today, his version still includes the fact

25  that he -- that he's accepting that his bullet

26  may have hit the victim and may have shot his

27  **RAYMOND GREEN     E-68189     DECISION PAGE 4     10/27/05**

82

1    brother.  As far as I'm concerned, these psych

2    evaluations are an absolutely waste of paper.

3    Once again, the multi-year denial is also based

4    on the fact that Mr. Green has not yet

5    adequately participated in programming that is

6    essential to his adjustment and needs additional

7    time to gain that programming.  He has only

8    participated in substance abuse programming for

9    about a year.  He has a significant history of

10   substance abuse.  He has indicated today that he

11   did some programming on the outside prior to

12   coming to prison for this offense and that he

13   intends to do some programming on the outside

14   when he gets a parole date.  Yet, in spite of

15   the fact that this crime involved drugs, he has

16   chosen not to participate in substance abuse

17   programming up until very recently while he's

18   been incarcerated.  There's absolutely no way

19   that we can be sure, Mr. Green, that you have

20   the tools that you need when you get on the

21   outside if you're not doing the work while

22   you're on the inside.  If you're going -- you

23   tell us you're going to do it when you get

24   release, why in the world would we ever give you

25   a release date if you haven't been doing it

26   while you've been here.

27   **RAYMOND GREEN    E-68189    DECISION PAGE 5    10/27/05**

83

1          INMATE GREEN:  So I can speak now?

2          PRESIDING COMMISSIONER FISHER:  No.  You

3    can't speak now.

4          INMATE GREEN:  Okay.

5          PRESIDING COMMISSIONER FISHER:  I'm just

6    trying to get your attention.

7          INMATE GREEN:  Well you're asking me a

8    question and I'm you know --

9          PRESIDING COMMISSIONER FISHER:  Well let

10   me just tell you.  Commissioner Mejia gave you a

11   couple of opportunities today to talk about

12   substance abuse programming.  And I want you to

13   understand that the Panel and the Board as a

14   whole is looking for the work that you're doing

15   to make yourself suitable, which means that the

16   kind of -- kind of shoring up that you do to

17   make sure that you're not going to backslide

18   when you got on the outside.  If you're not

19   going to do the work in the institution, there's

20   no way for us to know whether or not you're

21   going to backslide.  And as Commissioner Mejia

22   pointed out to you today, you've been here for a

23   long time and you've only started doing

24   substance abuse programming the last year.  Most

25   of the self-help that you've been doing has been

26   very recent.  You were -- You participated in

27   **RAYMOND GREEN    E-68189    DECISION PAGE 6    10/27/05**

84

1   Anger Management in '04.  You participated in

2   the video about how to become a father and not

3   get angry and you participated in a seminar

4   related to legal services for prisoners.  And

5   you participated in your Muslim works.  But all

6   of that, except for the possible -- possibly

7   your religious participation has been very, very

8   recent.  And I want to -- I want to commend you

9   for the two vocations that you've completed.

10  Those are very important and those are things

11  that we want to see you do so that you're

12  employable on the outside.  But it's also

13  really, really important to us that you work on

14  the issues that brought you here in the first

15  place.  And one of the major issues is substance

16  abuse.  The other thing that really concerns me,

17  and unfortunately because we didn't talk about

18  the offense today we couldn't ask you the

19  questions, so what we had to do was look back at

20  what've you said in the past.  And I'm very

21  concerned about the fact that you are giving us

22  a version of what happened that day that

23  absolutely flies in the face of the witness

24  testimony and the evidence.  So I would

25  encourage you prior to your next hearing to

26  review your file, read all of the information,

27  RAYMOND GREEN    E-68189    DECISION PAGE 7    10/27/05

85

1    the probation officer's report and the Appellate

2    decision.  And if you plan to talk about the

3    crime, be prepared to answer the hard questions

4    because what you're saying in this report just

5    -- I just frankly don't believe it.  And that

6    completes the reading of the decision.  Do you

7    have any comments?

8         **DEPUTY COMMISSIONER MEJIA:**  No further

9    comments.

10         **PRESIDING COMMISSIONER FISHER:**  Okay.

11   That completes --

12         **DEPUTY COMMISSIONER MEJIA:**  Good luck to

13   you.

14         **PRESIDING COMMISSIONER FISHER:**  -- the

15   hearing.  Thank you.

16                    --oOo--

17

18

19

20

21

22

23   PAROLE DENIED FOUR YEARS          FEB 2 4 200

24   THIS DECISION WILL BE FINAL ON  _____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   RAYMOND GREEN    E-68189    DECISION PAGE 8    10/27/05

86

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 85, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RAYMOND GREEN, CDC No. E-68189 on OCTOBER 27, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated November 11, 2005 at Sacramento County, California.

Marsha Mees
Transcriber
**PETERS SHORTHAND REPORTING**

# EXHIBIT   B

*MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS*
*(REVISED AUGUST 1998)*
*PAROLE CONSIDERATION HEARING*
*NOVEMBER 2005 LIFER CALENDAR*

*CORRECTIONAL TRAINING FACILITY, SOLEDAD*
*OCTOBER 1, 2005*

*NAME:*          GREEN, RAYMOND
*CDC #:*         E-68189
*DOB:*           08/14/64
*OFFENSE:*       Penal Code 187, Murder, Second Degree
*SENTENCE:* 15 years to Life
*DATE OF OFFENSE:* 02/23/88
*MEPD:*          10/05/02
*EVALUATION DATE:* 10/01/05

### IDENTIFYING INFORMATION:

Inmate Raymond Green is a first-term, African-American, single male who is 41 years of age. He is active in the Muslim faith. He has completed 17 years in custody.

### SOURCES OF INFORMATION:

This evaluation is based upon a single, 90-minute, psychodiagnostic interview, along with review of the Central file.

This evaluation was completed because the Board of Prison Terms' panel, on 02/20/02, requested a new psychological evaluation.

The previous psychological evaluation, completed at Pleasant Valley State Prison on 08/09/01 by Dr. Judith Dietch, is a very thorough, in-depth, valid report that is still very current. This was a positive evaluation. I agree completely with the prior evaluator's conclusions. At that point, she did not see him as a threat to the institutional environment, and she did not see him as posing a threat to the community.

### CLINICAL ASSESSMENT

### CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Green is an individual with no serious mental or emotional problems. He related in an outgoing, serious, earnest manner. His hygiene and grooming were appropriate. He was alert and well oriented. His thinking was rational, logical, and coherent. His speech was normal, fluent, and goal-oriented. His affect was appropriate. There was no evidence of depression or anxiety. Intellectually, he is functioning in the average ranges.

GREEN, RAYMOND
CDC NUMBER: E-68189
BPT MENTAL HEALTH EVALUATION
PAGE TWO

There is no evidence of thought disorder or cognitive impairment. His judgment continues to be good. His memory continues to be intact. His insight, or self-awareness, is good.

Inmate Green has remained totally abstinent from any use of drugs or alcohol since he completed the Tarzana Treatment Center in 1988. He has been clean and sober now for 17 years, although drugs and alcohol are readily available in the institutional environment. His changed lifestyle, religious convictions, and determination to remain abstinent is significant and sincere. Drug and alcohol abuse is no longer a problem in this case.

Inmate Green reports a very close-knit, supportive family. He gets frequent visitors from his family members, including his two daughters who are adults now. He has a great deal of family support in the community, as evidenced by letters of employment and residence available.

In order to determine the current risk level, the Level of Service Inventory was administered. This is an actual measure that considers the criminal history, the history of violence, the educational accomplishments, the family relationships, the drug and alcohol history, as well as other factors. His points were elevated due to a history of drug use and criminal behavior, as well as the commitment offense. At this point, his risk level score is at the 4.2 accumulative frequency level in comparison to other inmates. This places him at the low risk range of potential dangerous behavior.

There is no indication of any mental or emotional problems in this case. He does have a history of drug abuse. However, 17 years of being clean and sober indicates that this is no longer a current problem. Based on his arrest record, he has been considered an antisocial personality. However, his years of positive adjustment, his determination and achievement, his ability to stay on track in acquiring vocational skills, etc., do not indicate an antisocial personality disorder.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

| | |
|---|---|
| AXIS I: | No contributory clinical disorder. |
| AXIS II: | No contributory personality disorder. |
| AXIS III: | No contributory physical disorder. |
| AXIS IV: | Life-term incarceration. |
| AXIS V: | Current GAF = 90. |

### REVIEW OF LIFE CRIME:

The circumstances of the commitment offense were reviewed. Inmate Green repeated what happened, and this is well documented in the prior psychological evaluation. Therefore, the details need not be repeated. He described the situation as a robbery that went bad. The robbers were after drugs and money, and they attempted to rob him.

*GREEN, RAYMOND*
*CDC NUMBER: E-68189*
*BPT MENTAL HEALTH EVALUATION*
*PAGE FOUR*

*M. Macomber, Ph.D.*
*Clinical Psychologist*
*Correctional Training Facility, Soledad*

*Bill Zika, Ph.D.*
*Senior Supervising Psychologist*
*Correctional Training Facility, Soledad*

*MM/gmj*

*D: 10/01/05*
*T: 10/05/05*

*D:\Word Files\BPT - 2005\GREEN, RAY  E-68189  10-05  MACOMBER.doc*



# CRIMINON™

"There is no person alive who cannot make a new beginning."
– The Way to Happiness

*Does hereby certify that*

## Raymond Green

*Has satisfactorily attained the requirements necessary and is hereby awarded a Certificate of Completion of*

# The Way To Happiness Course

*This* 26 *day of* July 20 01

Certificate # 6880

*Sandra B*
Extension Course Supervisor

*Lucy Cole*
**CRIMINON** Executive Director

Trademark 2000
CRIMINON® is a TRADEMARK owned
by The Association For Better Living
And Education and is used with its permission

The Way To Happiness is a Trademark owned by
The L. Ron Hubbard Library and is used with its permission
© 2000 The Way To Happiness Foundation
All Rights Reserved. - Printed in USA

CRIMINON™



"There is no person alive who cannot make a new beginning."
– The Way to Happiness

*Does hereby certify that*

## Raymond Green

*Has satisfactorily attained the requirements necessary and is hereby awarded a Certificate of Completion of*

# The Handling Suppression Course

*This* 4 *day of* September 20 02        *Certificate #* 1580

*Sandra B.*
Extension Course Supervisor

*Lucy Cole*
**CRIMINON** Executive Director

Trademark 2000
CRIMINON® is a TRADEMARK owned
by The Association For Better Living
And Education and is used with its permission

The Way To Happiness
The Way To Happiness is a Trademark owned by
The L. Ron Hubbard Library and is used with its permission
© 2000 The Way To Happiness Foundation
All Rights Reserved. – Printed in USA



# CRIMINON™

*"There is no person alive who cannot make a new beginning."*
— *The Way to Happiness*

*Does hereby certify that*

## Raymond Green

*Does satisfactorily attained the requirements necessary and is hereby awarded a Certificate of Completion of*

# The Communication Tools Course

*This* 12 *day of* October 20 01

*Certificate #* 6962

*Sandra B.*
Extension Course Supervisor

*Lucy Cole*
**CRIMINON** Executive Director

Trademark 2000
CRIMINON® is a TRADEMARK owned
by The Association For Better Living
And Education and is used with its permission

The Way To Happiness is a Trademark owned by
The L. Ron Hubbard Library and is used with its permission
© 2000 The Way to Happiness Foundation
All Rights Reserved. - Printed in USA

# Valley Adult School

awards a

## Certificate of
## RECOGNITION

FOR

Completion of Fifteen (15) Video Reports

TO

## Mr. Raymond Green

_____
Instructor
B. Henares

_____
Supervisor of Academic Instruction
Dr. M. Abdul-Mateen

_____
Supervisor of Education
G. E. Atchley

# Certificate of Completion

presented to

## R. Green

for completion of the Interfaith based

## ANGER MANAGEMENT COURSE

presented this third day of December in the year 2004 . He is commended for his
participation and enthusiasm in this endeavour.



**IMAM ANTAR JANNAH**
Muslim Chaplain/Course Instructor
Correctional Training Facility

Correctional Training Facility-Soledad

# CERTIFICATE OF PARTICIPATION

*Presented To:*

## R. GREEN

R. Green, E-68189, the Fathers Behind Bars Activity Group - Central Facility is honored to present this certificate for your participation in the **Legal Services For Prisoners With Children Seminar** on June 15, 2005, with L.S.P.C. Staff Attorney Cassie M. Pierson.

The knowlege and exercise of your parental rights will benefit society in many ways, as well as assist you in actively participating in the lives of your children and molding them into better citizens.

Presented on this 30th day of June, 2005, at Soledad, California, in the County of Monterey.

CASSIE M. PIERSON, ESQ.
Legal Services for Prisoners With Children
L.S.P.C. Staff Attorney

JOLEE SELVIDGE, CC-III
Fathers Behind Bars Activity Group
Staff Sponsor



## VALLEY ADULT SCHOOL

### Awards a

### Certificate of
# PARTICIPATION

For
Completion of Ten (10) Video Reports

To
Mr. Raymond Green

Program Facilitator _B. Henares_
B. Henares

## VALLEY ADULT SCHOOL

### Awards a

### Certificate of
# PARTICIPATION

For
Completion of Five (5) Video Reports

To
Mr. Raymond Green

Program Facilitator _B. Henares_
B. Henares

NAME (LAST,FIRST)  Green, Raymond          CDC NUMBER  E-68189    CELL/BED  G-250L    CDC-128B

Inmate Green,  E68189, has successfully completed the first series of 15 educational video reports.  He should be commended for his outstanding efforts.

Distribution:
C-File
Video File
ED-File
Inmate

*B. Henares*

**B. Henares**
**CTF-C Recreation Supervisor**

**DATE:** October 26, 2005          **INFOMATIONAL CHRONO**

CDC-128 B (8-87)

STATE OF CALIFORNIA

Name  GREEN, R.          CDC #  E-68189          Housing  CW-250L

Inmate Green, R., has successfully completed a series of lectures entitle: "How to become a Father, and not get Angry." Sponsored by CTF's Muslim Development Center.  The series is designed to enlighten participants regarding the ever changing role of the father's in the American Society and how, despite social pressures, the fundamental responsibilities of father's have not changed.  Our study also examined the father's as husbands and community leaders.  The primary goal of this program is to contribute to the development of knowledgeable individuals who have within themselves the potential to become model fathers and community leaders.  Inmate Green, R., participation in the  program entitles him to the documentation and a Certificate of Completion.

*Iman Antar Jannah*

Iman Antar Jannah
Muslim Chaplain
Correctional Training Facility- Central

ORIG    :   C-File
cc      :   Inmate
        :   Chaplain

Date    01/05/05

Informational Chrono (Father  Anger Management Course)

CDC-128E

NAME and NUMBER:  **GREEN**          **E-68189**          **G-250L**

Inmate **GREEN** participated in the LEGAL SERVICES FOR PRISONERS WITH CHILDREN SEMINAR held at CTF-Central on June 15, 2005.  L.S.P.C. staff attorney Cassie M. Pierson provided an informative 2 hour seminar discussing the services provided by L.S.P.C. and various topics of interest on the parental rights of prisoners.  Attorney Pierson provided a lengthy question and answer session, addressing in detail the specific legal and social concerns of the inmates in attendance.  Attorney Pierson also placed special emphasis on the importance of maintaining a healthy relationship with ones children and family, as well as the community, as an integral component in the successful rehabilitation of prisoners with children.   Inmate **GREEN'S** interest, participation and action in expanding his knowledge of parental rights is to be commended.

Orig:  C-file
CC:  CC-I
        Inmate

*J. Selvidge*

J. Selvidge, CC-III
Sponsor–Fathers Behind Bars Group
CTF-Central Facility

DATE 06-15-2005          **LAUDATORY CHRONO**          GENERAL CHRONO

# State of California

# High School Equivalency Certificate

This is to certify that

## RAYMOND A. GREEN

has met the standards established by the California State Board of Education for successful completion of the tests of General Educational Development and is therefore entitled to this High School Equivalency Certificate.



August 20, 1996

*Marion McDowell*
President of the California State Board of Education

*Delaine Eastin*
State Superintendent of Public Instruction

19980620AC03

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES**<br>COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA  90012<br><br>PLAINTIFF/PETITIONER:<br><br><br>RAYMOND GREEN | Reserved for Clerk's File Stamp<br><br>**CONFORMED COPY**<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>**OCT 2 7 2006**<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br>BH003825 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- [ ] Order Extending Time
- [ ] Order to Show Cause
- [ ] Order for Informal Response
- [ ] Order for Supplemental Pleading
- [ ] Order re: Request for Extension of Time
- [x] Order re: Writ of Habeas Corpus
- [ ] Order re:
- [ ] Copy of

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

October 27, 2006
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
        Joseph M. Pulido

Raymond Green
E-68189
Correctional Training Facility – Soledad
P.O. Box 689
Soledad, CA 93960-0689